36411.  SWIFT & COMPANY *v.* LAWSON *et al.*
36412.  WOOD *v.* LAWSON *et al.*

DECIDED JANUARY 11, 1957—REHEARING DENIED FEBRUARY 6, 1957,
IN CASE No. 36411.

36

*Carl K. Nelson, Nelson & Nelson,* for plaintiff in error, case No. 36411.

*Williams & Smith, Price, Spivey & Carlton, M. Cook Barwick, Wilson, Branch & Barwick,* contra.

*Price, Spivey & Carlton,* for plaintiff in error, case No. 36412.

*Williams & Smith, M. Cook Barwick, Carl K. Nelson, Nelson & Nelson,* contra.

FELTON, C. J. ▮ The first question to be decided on the question of jurisdiction of Swift & Company is whether a nonresident is required to have an agent in the county *and* an office or place of business. Our conclusion is that having an agent within a county of such a kind as could be served is alone sufficient to give jurisdiction of the nonresident corporation if service upon the agent is had. Maintaining an office within the county by the corporation is not necessary in such a case. The rule is the same as to both resident and nonresident corporations except that in the case of resident corporations jurisdiction of the corporation in contract actions requires that it have an agent transacting business and that it maintain an office. Code §§ 22-1101 and 22-1102. The following decisions make these statements crystal clear: *City Fire Ins. Co.* v. *Carrugi,* 41 *Ga.* 660, 671; *Williams* v. *East Tenn., Va. & Ga. Ry. Co.,* 90 *Ga.* 519, 520 (16 S. E. 303); *Saffold* v. *Scottish American Mortgage Co.,* 98 *Ga.* 785, 787 (27 S. E. 208); *Reeves* v. *Southern Ry. Co.,* 121 *Ga.* 561 (1) (49 S. E. 674, 70 L. R. A. 513, 2 Ann. Cas. 207); *Tuggle* v. *Enterprise Lumber Co.,* 123 *Ga.* 480 (51 S. E. 433); *L. & N. R. Co.* v. *Meredith,* 194 *Ga.* 106 (21 S. E. 2d 101); *Adams & Co.* v. *Douglas-Coffee County Hospital Authority,* 209 *Ga.* 62, 63 (3) (70 S. E. 2d 730); *Padrick* v. *Kiser Co.,* 33 *Ga. App.* 15 (124 S. E. 901); *Dowe* v. *Debus Mfg. Co.,* 49 *Ga. App.* 412, 413 (2) (175 S. E. 676). The three cases cited by the plaintiff in error, *Jones* v. *District Grand Lodge &c.,* 12 *Ga. App.* 273 (76 S. E. 279); *Ellis* v. *Southern Express Co.,* 27 *Ga. App.* 738 (110 S. E. 43), and *Padrick* v. *Kiser Co.,* supra, are contract cases involving resident corporations. The holdings in *Reeves* v. *Southern Ry. Co.,* supra; *Southern Ry. Co.* v. *Parker,* 194 *Ga.* 94 (1) (21 S. E. 2d 94), and *L. & N. R. Co.* v. *Meredith,* supra, are not contrary to what has been said above.

▮ The next question as to the matter of jurisdiction is whether Hall was an agent upon whom service could be made so

as to give the court jurisdiction of Swift & Company. The contract between Swift & Company and O. A. Hall, the alleged agent of Swift & Company, who was served with copies of petition and process, is as follows:

"Swift & Company 11-27-1950. Swift & Company, a corporation, hereinafter designated as principal, hereby appoints O. A. Hall, of Summit, County of Emanuel, State of Georgia, hereinafter designated as agent, for the sale, on commission and for its account, of such quantities and brands of plant food as may be mutually agreed upon from time to time on the following terms and subject to the conditions hereinafter mentioned, and the said agent hereby accepts the appointment and agrees to comply with all the terms and to perform all of the conditions hereof;

"1. Agent an independent contractor: It is understood and agreed that neither agent nor any employes of agent shall be deemed or construed to be an employe of principal, and neither agent nor employes of agent shall be entitled to benefits of an employe of principal, such as, but not limited to, workmen's compensation, group insurance, vacation, pension, and unemployment insurance.

"2. Duration: This contract shall remain in effect until terminated for any reason, at any time, by either party upon giving written notice, but only upon written notice. If contract is terminated, the principal shall have the right to withhold further deliveries whether on unfinished or new business, and all accounts, at the option of the principal, may become due and payable at once. Upon termination all new business shall cease but the terms of this contract shall govern the closing of all unfinished business. The termination of this agency for any reason shall be without prejudice to the rights of the principal against the agent.

"3. Selling: Agent agrees to seek business diligently and to create a demand for principal's products. Agent further agrees, in the event any portion of said goods remains unsold, to deliver such unsold balance on demand by principal to agent's nearest railroad station in good shipable condition, subject to order of principal, free from expense to principal, and agent further agrees to prepay transportation charges thereon to the point of original shipment.

"4. Prices and terms: Principal shall furnish agent price lists in writing from time to time which shall be a part of this contract as effectively as if written herein. Said price lists shall state prices, terms, commissions, accounting dates, and other conditions governing the sale of plant foods not otherwise provided for herein. Each price list and any or all of its provisions are subject to change from time to time upon written notice from the principal. Every sale made by the agent shall be made subject to all the provisions of this contract including the price list effective on date of such sale. Orders taken by agent from customers on which plant foods are not delivered immediately to the customer will, and until the plant foods have actually been delivered to the customer, be subject to change in prices as aforesaid, unless such customers' orders have been theretofore submitted by agent and approved by principal.

"5. Commissioners: (a) Principal shall pay agent as full compensation for all services and for storage, cartage, collecting, insuring, and for agent's guaranty of payment of all sales, and for all other expenses, a commission to be specified by the principal from time to time in writing. (b) Principal shall allow agent an additional commission to be specified by the principal from time to time in said price lists for cash turned in to principal in accordance with said price lists.

"6. Settlement and accounting: (a) Agent shall obtain cash or promissory notes from purchasers at the time of delivery to them of any of said plant foods, the notes to be on forms furnished by principal, payable to principal, drawing interest at the rate and maturing on the dates specified by said price list, in settlement for all plant foods under this contract. (b) Agent shall make full settlement to principal at said district office on the respective accounting dates for spring and fall sales specified in said price lists, or before these dates, if requested by principal, with cash for all cash sales and purchaser's notes for all time sales.

"7. Principal's property to be kept separate: All unsold plant foods in the hands of the agent and proceeds of sales of plant foods, whether cash, notes, or accounts, shall at all times be the absolute property of the principal and subject to the principal's

orders and shall be kept by the agent separate and apart from all other plant foods, cash, notes, and account. This provision shall not be affected in any particular by the agent's giving his guaranty note for the invoice value of all plant food at time of shipment to him or thereafter.

"8. Guaranty of payments: Agent absolutely and unconditionally guarantees prompt payment when due, without principal first exhausting remedies against principal debtors, of all notes and accounts resulting from sales of said plant food made by agent, and as evidence of agent's said guaranty, agent agrees to execute and deliver to principal his guaranty note on form furnished by principal to mature as specified in price list. Said guaranty note shall be for the full invoice price of shipment of plant food and shall be delivered to principal at time of shipment to agent unless a later date is specified in writing by principal. This note is a guaranty note only and shall in no particular affect the relation of principal and agent created under this contract. Agent hereby waives demand, protest and notice of default in payment by principal debtors of said notes and accounts resulting from sales of plant food made by agent. Authority and consent are hereby expressly given said principal from time to time, and without any notice to agent, to give and make such extensions, renewals, indulgences, settlements, and compromises as it may deem proper with respect to any of said notes and accounts. The agent's guaranty note shall be credited with the invoice value of all unsold plant food on hand at the end of the season and all cash proceeds of sales and all cash collections turned over to principal on or before final accounting dates. Should suit be brought by principal to enforce any of the obligations created pursuant to this contract, agent agrees to pay all costs, expenses and attorney fees incurred by principal therein, and in the event principal incurs cost or collection expense of any kind in collecting or attempting to collect notes or accounts of principal debtors accruing from sales pursuant to this contract, only the net amount received by principal from such notes or accounts shall be credited on the guaranty note or notes as agent.

"9. Any unsold plant food on hand on final accounting date shall be conclusively presumed to be a part of the last shipment

of that grade and shall be credited to agent accordingly, any excess amount to be conclusively presumed to be a part of the shipment made second to the last and so on in inverse order of shipments chronologically.

"10. Collection. On or before maturity dates of purchasers' notes, as specified in said price lists, principal will, if it so elects, return to agent all of said purchaser's notes for collection, which notes agent agrees to collect as agent of principal, free of expense to principal, and to remit to principal as and when received all amounts so collected.

"11. Freight and storage: Agent agrees to unload upon arrival at destination, and to keep clar [sic] of demurrage, and also to keep all plant foods consigned herein properly stored and cared for while in his charge and to be responsible therefor.

"12. Records: Agent shall keep a separate record of sales, payments, note transactions and stocks on hand for principal, which principal may examine on demand. Agent shall furnish principal a report of goods remaining on hand and unsold on accounting dates specified in said price lists or at any other time upon request of principal.

"13. Guaranty of analysis: All deliveries and sales of plant foods under this agreement, including those to agent, if any, shall be made with the guaranty only of analysis printed on the sacks and not any warranty or guaranty of results from use, nor of effect thereof upon crops, nor any other warranty or guaranty whatsoever, whether of the same kind or not. All deliveries and sales, including those to agent, if any, shall be made upon waiver of all claims, objections, damages, or reclamations of every kind whatsoever, except claim for the actual commercial value (or if this is unlawful then amount prescribed by valid statute) of deficiency in analysis when and only when determined by analysis made by the State Chemist (or other official authorized by law) from samples taken in the presence of the seller (or in any other manner prescribed by valid statute) from plant foods on which claim is made. Principal shall not be liable to make good to any agent any deficiency or claim or deficiency made or presented by any person purchasing from or through agent, and agent shall save principal harmless from all loss or damage arising from any

failure or omission of agent to comply with any of the agreements herein contained.

"14. Withholding deliveries: Principal shall have the right to withhold further deliveries under this contract whether on unfinished or new business in case it receives any information regarded by it as unfavorable to agent's credit, or in the event of any breach of contract by agent.

"15. Contingencies: Principal shall not be liable in any respect for failure or delay in the fulfillment or performance of this contract, or any sales or orders taken hereunder, if prevented or hindered, directly or indirectly, by war, conditions of war, inadequate transportation facilities, fire, flood, cyclone or other agency, or strikes, or inability to obtain raw materials (foreign or domestic), or governmental interference, embargoes, or any cause beyond its reasonable control, whether of the same kind or not.

"When orders are received by principal from agent, principal shall have a reasonable time within which to make shipment.

"16. If agent desires to purchase plant food from principal for use in making his own crop, he shall notify principal in writing at the beginning of each season of the quantity which he desires so to purchase. However, agent's purchases shall be limited to such quantities as agent and principal may mutually agree upon in writing. Such purchase or purchases shall be at the prices and subject to all the terms and conditions herein provided.

"17. Agent shall have no lien whatsoever on any property of any kind of the said principal which may come into his possession. Agent waives all rights of setoff, recoupment, or counter claim or plant food consigned hereunder, and all cash, notes and accounts resulting from the sale thereof.

"This agreement as written and printed shall be binding only when confirmed in writing by the District office of Swift & Company at Savannah, Georgia.

"No person other than a duly authorized district manager of said principal at said district office has authority to waive or to enlarge the terms of this contract and when done by such district manager it must be in writing and attached hereto, or endorsed hereon. No agreement not expressed herein shall be binding upon the principal. [Signatures omitted]"

The contract is unambiguous and is not susceptible to explanation. Swift & Company contend that under the contract Hall was an independent contractor engaged in buying materials from Swift & Company at wholesale and selling to his own customers at retail as an independent dealer free from control and direction of Swift & Company. We cannot agree that Hall was an independent contractor. Under the terms of the contract he was an agent of Swift & Company. 1. The first paragraph of the contract provides that Hall was appointed as commission agent for the sale of Swift & Company's plant food to be sold for the account of Swift & Company. 2. Paragraph 3 of the contract provides that in the event any portion of the goods remained unsold the agent agreed to deliver them on demand to principal, free from expense. 3. Paragraph 4 provides that principal shall furnish agent price lists in writing from time to time which would be a part of the contract. The price list could include prices, terms, commissions, accounting dates and *other conditions* governing the sale of plant foods not otherwise provided for in the original contract. Paragraph 4 also provides that prices would be subject to change before immediate delivery to customers if the orders of the customers had not been submitted by agent and approved by principal. The contract nowhere provides that Swift & Company had no right to disapprove a customer selected by the agent. 4. Paragraph 6 provides that the agent should obtain cash or promissory notes from purchasers and in the event notes were taken they were to be on forms furnished by Swift & Company, payable to Swift & Company, drawing interest at a rate specified by Swift & Company and due on dates specified by Swift & Company. One of the notes by a customer was introduced in evidence which includes the statement, "The above note represents plant foods bought from and received of Swift & Company as follows:" The remaining provisions of the contract all go to show, despite the statements to the contrary in the contract that Swift & Company was the principal and that Hall was the agent. 5. Paragraph 14 provides that Swift & Company had the right to withhold further deliveries whether on unfinished or new business in the event it received any information regarded by it as unfavorable to agent's credit. Under the circumstances of this

case the financial responsibility of a prospective purchaser from Mr. Hall could be considered by Swift & Company to affect Mr. Hall's credit and in such event, Swift & Company would have authority, if it did not otherwise already have it, to approve or disapprove of any credit customer proposed by Mr. Hall. 6. Paragraph 16 even goes so far as to provide that Mr. Hall could not sell to himself goods for his own use without the approval of Swift & Company.

The plaintiff also introduced in evidence a statement by O. A. Hall certifying to a list of accounts, liens and notes representing sales of plant food made by Hall as agent for Swift & Company and stating that the accounts and notes enumerated, together with all the collections made on said accounts and notes, were held in trust for account of Swift & Company to be kept separate and apart from other moneys and funds in connection with Hall's business.

Harvey B. Brown, the division credit manager of Swift & Company testified that Mr. Hall resold plant food obtained from Swift & Company to customers of his own choosing and that the company had nothing to do with selection of the people to whom Hall sold the material. He also testified that Hall's duties and obligations were covered by the contract above set forth. He further testified that approval was given for Hall to resell a certain amount and that Hall in turn took the notes and turned them over to Swift & Company as a guarantee of a personal note from Hall to Swift & Company and that Swift & Company in turn sent the farmers' or customers' notes back to Hall for collection for the account of Swift & Company; that the customers' notes were merely collateral for Hall's note and merchandise credit.

We think that the above facts and circumstances demanded the finding that O. A. Hall was an agent of Swift & Company of fiduciary nature and entrusted with important discretion and judgment and that he was not a mere employee or servant of Swift & Company. He was not an individual contractor as hereinbefore shown. He was such an agent and with such authority as the law contemplates in respect to the likelihood that he would protect the interests of his principal by delivering to it

the copy of the petition and process with which he was served as agent.

The facts in *Turner* v. *Southeastern Greyhound Lines,* 74 *Ga. App.* 548 (40 S. E. 2d 777) show a state of facts less conclusive than those in the instant case and we are of the opinion that the facts in the instant case are stronger for the case of agency and the types of agency necessary than in the case above cited and also in the following cases: *Southern Bell T. & T. Co.* v. *Parker,* 119 *Ga.* 721 (47 S. E. 194) ; *Georgia Power &c. Co.* v. *Wilson,* 48 *Ga. App.* 764 (173 S. E. 220), and *Georgia Railway &c. Co.* v. *Head,* 155 *Ga.* 337 (8) (116 S. E. 620).

Special ground 1 of the amended motion for new trial on the issue as to jurisdiction of the court is without merit. The ground of the motion is that Harvey B. Brown was permitted to testify in substance that E. H. Wood was an agent of Swift & Company but not at the time of the trial. The complaint is that the testimony was harmful and prejudicial on the question of the alleged agency of O. A. Hall. The evidence demanded the finding that Hall was an agent of Swift & Company and the testimony if erroneously admitted was harmless. Special ground 2 is also without merit in that the admission in evidence complained of was harmless even if erroneous; however, the instrument signed by J. J. Hartley was admissible to show what the provisions of the instrument were in that the contract provided that the form of instrument was to be furnished by Swift & Company. Special grounds 3, 4 and 5 are without merit because the evidence demanded the finding that Hall was an agent of Swift & Company and any errors in the charge, assuming for the sake of argument that the charges complained of were erroneous, were harmless. The general grounds and special ground 6, which is merely a repetition of the general grounds, are without merit.

The court did not err in denying the motion for new trial filed by Swift & Company in the matter of the plea to the jurisdiction of the court.

■ Swift & Company filed general and special demurrers to the petition as amended. These demurrers are very lengthy and we do not think it is necessary to discuss them in detail. The allegations of the petition as amended are set forth above and

in our opinion answer any objection that is made in the demurrers. The objectionable parts of the petition were stricken by amendment, and if there was any harm done by the filing of the amendment on the second day of the trial, it will not be necessary for us to consider such a point since the case is being reversed and the harmfulness of the action removed from the case. The court did not err in overruling the general and special demurrers of Swift & Company to the petition as amended.

■ Special ground 1 of the amended motion for new trial in the main case complains of the admission of testimony of H. W. Durden who testified as to statements made to him by defendant Wood at the Twentieth Century Club where Wood was just before the event which caused the death of the plaintiff's husband. H. W. Durden testified as to what Wood told him as follows: "He told me he was waiting on some friends, or something. He said he had been down there and left his hat and some papers; he told me he did. . . I walked in there and me and him started talking, and he said he hadn't finished his job yet but he was waiting on them and looked like he would have to leave. He said he was waiting on some people from Vidalia. I don't know the dealer down yonder. . . He said he hadn't finished up, but he was tired and he thought he would go ahead and not wait on them any longer. . . He waited and waited, and had some papers there, and told me he had left some papers; he had been figuring down there in a booth, and he had left them and come back after them. He had done come back the other night before then to get them, then he had been to Lyons and couldn't contact the people and they was supposed to meet him up there to buy some fertilizer or something. That's what he told me he was doing." The complaint is that the declarations of the agent of Swift & Company, Wood, were not a part of the res gestae and not in corroboration of any other evidence that Wood was acting as agent of Swift & Company when he was at the Twentieth Century Club. There was a rebuttable presumption that Wood was acting within the scope of his employment *when he hit the plaintiff's husband on his way back* to a motel from the Twentieth Century Club. There was no evidence that Wood was on business for Swift & Company *at this club,* and there is no presumption

to that effect, and the testimony of Durden, above quoted, was not admissible as part of the res gestae because the declarations of the agent Wood were not made while he was engaged in a business transaction or otherwise acting for Swift & Company. *King* v. *Bonnerman*, 93 *Ga. App.* 210 (91 S. E. 2d 196). (This case has been criticised, very likely not without probable cause, on the ground that it is contended we should have held the agent's admission admissible as impeaching evidence since his alleged admission after the collision contradicted his testimony. In the first place, no foundation was laid in that case for impeachment by prior contradictory statements. Code § 38-1803. In the second place even if such a foundation had been laid and the evidence admitted solely for impeachment purposes, the result might have been the disregarding of the agent's testimony and there was no evidence otherwise to authorize even a prima facie inference that the agent was on business for his principal at the time of the collision.) In this case even if it could be said that under the circumstances the testimony could have been considered as impeaching, it was not originally admitted for such purpose. In the eyes of the jury it was admitted as substantive evidence on the question of agency. Wood was not a general agent of Swift & Company. The admission of this testimony under such circumstances was erroneous and harmful, and requires the grant of a new trial.

■ Special ground two complains of the following testimony of H. W. Durden: "In selling fertilizer for Swift & Company, I came in contact with Woods some. There is no doubt in my mind who he worked for. I have rode out with him to the Seminole Club and had a few drinks with him out there in the Swift & Company car. . . When I mentioned about going out to these other clubs with him and taking a drink every now and then, he was on business at that time. When we went out there, he did not have any business friends or prospective customers; we just talked about fertilizer, and Frank and all of us, fertilizer and cotton seed." The court erred in admitting this testimony. The fact that Wood was on business at other places and times would not tend to prove that Wood was on business at the Twentieth Century Club on the night in question under the facts and circumstances of this case.

■ Special ground four complains that the court by charging on the subject three times over-emphasized the burden of proof upon Swift & Company to rebut the prima facie presumption that Wood was in the scope of his employment at the time of the tragedy which arose upon proof that at the time he was operating an automobile of Swift & Company while in its employ. Whether or not this repetition is harmful error requiring the grant of a new trial, it is not necessary to decide as the error will not likely recur on the next trial. The assignment of error on these charges does not include a valid assignment of error on the court's failure to charge as to how the presumption might be rebutted.

■ As to the general grounds and special ground three, Swift & Company contends that the evidence demanded a verdict for Swift & Company because the prima facie presumption that Wood was in the course of employment when he hit the deceased was entirely overcome by the direct, positive and unimpeached testimony of Wood that he was not in the course of employment at such time but was on a personal mission. This contention is without merit for the reason that the testimony of Wood was not unimpeached. A witness may be impeached·by disproving material facts testified to by him. Code § 38-1802. This Code section applies whenever there is a conflict in testimony (*Southern Ry. Co.* v. *O'Bryan,* 119 *Ga.* 147, 150 (2), 45 S. E. 1000, *Wilcox* v. *Wilcox,* 31 *Ga. App.* 486 (5a), 119 S. E. 445, and *Black & White Cab Co.* v. *Cowden,* 64 *Ga. App.* 477 (2), 13 S. E. 2d 724), and no foundation need be laid for impeachment thereunder. *Deaton* v. *Swanson,* 196 *Ga.* 833 (2) (28 S. E. 2d 126). If a jury determines that a witness has been impeached as to a material fact in the case, it can disbelieve his entire testimony. Code § 38-1806; *Georgia R. & Bkg. Co.* v. *Andrews,* 125 *Ga.* 85 (1) (54 S. E. 76); *Haas & Howell* v. *Godby,* 33 *Ga. App.* 218, 227 (125 S. E. 897).

The following show some statements by Wood contradictory to those made by other witnesses: Elmer Hailey Wood, defendant, testified in part as follows: "I saw Mr. Hubert Durden while I was at the Twentieth Century. I did not have any business conversation with him at that time. I did not buy any liquor there at the Twentieth Century Club. I did not drink any there.

I did not take a drink, or any number of drinks, with Mr. Hubert Durden. . . I was not intoxicated the next morning. I recall when Troopers Johnson and Chisolm came to my room the next morning. I got up and dressed and went with these gentlemen. They did not tell me at that time, or at any time up until now, that I was under the influence that morning. I was not under the influence of liquor when they came out there. . . I certainly would have stopped my car if I hit anybody there, or an automobile—if I had known I had hit anybody or anything. I did not have any reason to believe that I hit anybody's car or hit anybody, because it didn't upset my car, and like I say, I saw a large dark object and apparently I got by it without any upset, so I didn't stop. There wasn't any crash. The side of my car did not hit anybody there. Nobody fell on the hood of my car, or on my car any way, and eventually fall off. I did not stop my car after coming in contact with this object in the road; I proceeded on to Swainsboro. . . I was in court yesterday afternoon when Mr. Hubert Durden testified for the plaintiff. . . I heard Mr. Durden's testimony, positive, direct sworn statement, that the automobile had on the side of it the letters 'Swift'—I heard him say it had letters on it. That is not true. There were no such letters 'Swift' or 'Swift & Company' painted on either side of that car, there was no printing on it at all. . . I did take a drink while I was there. I bought a half a pint while I was there. I got down to the Twentieth Century about ten minutes until two, I guess. Hubert Durden was there when I got there. I did not have a booth. I stayed out in the front there and talked to Mr. Durden. . . I didn't stop to see what had happened because, just like I said, there was no crash and apparently it was just a grazing lick. . . After I got to the Twentieth Century, I did not take any more whisky that night except out of that half-pint I said I bought before 1:30. As to whether I drank before I left the Seminole, I drank that half-pint and I bought a second half-pint and took one drink out of it."

W. J. Johnson, a State Trooper who arrested Wood an hour and forty minutes after Lawson was struck, testified for the plaintiff in part as follows: "Mr. Woods was in a staggering condition, and also his manner of speech was very muffled, and also the

alcoholic odor that came from Mr. Woods—he smelled as if he had been drinking. I got close enough to smell his breath. There was a definite odor of alcohol, and he was in a staggering condition at that time."

H. W. Durden testified for the plaintiff in part as follows: "I worked until 12 that night, almost to 12 o'clock. I closed my place over there at the snack bar here in Swainsboro, and I went from here to the Twentieth Century Club. . . To go ahead, I went in the place there and bought a half-pint of Early Times whisky. That was in the Twentieth Century Club. Then I walked around into the dance place—well, I first taken a small one and went around there and then I met Mr. Woods, Elmer Hailey Woods. He was sitting at the table, at the right-hand table, and nobody was with him. He didn't tell me what he was doing there. He just asked me to have a drink with him, and I told him I had done bought some, but he insisted and I taken one with him. . . I guess I was with Mr. Woods about an hour or an hour and a half down there. I drank about a half a pint. Woods wasn't doing too good; I have seen him quite a bit, and he was loaded, I will tell you that. He left first. During the time we were sitting around there in the booth, drinking, I offered to buy a bottle and he said, 'No, you save your money, I have the company's money; I have got an expense account'. I didn't buy any more."

George E. Broomell, who witnessed Melvin Lawson's being struck, testified for the plaintiff in part as follows: "The car, when it was I would estimate 30 or 40 feet from this other automobile which the man was standing at, he seemed to notice something in front of him, and he put on his brakes. It twisted his car where the rear wheels left the highway and then struck the man, struck the car, proceeded past the car about 50 feet, I would estimate, from the rear of that car, carrying the man with him he had hit. He stopped the car, and the man fell off the right end of the grill, or the right front side, onto the highway. And the car proceeded at a high rate of speed away from the accident. . . The man driving the car that hit him stopped dead still, and the Lawson body fell off. Then the man proceeded at a high rate of speed from the accident towards Swains-

boro. . . After he struck Lawson, he drug him along about 50 feet, I would say. He came to a complete stop, and Mr. Lawson fell off on the highway."

It follows that the jury was not bound to accept the testimony of Wood that he was not in the course of employment when the car he was driving hit the deceased, and could have based their finding on the failure of Swift & Company to rebut the prima facie presumption as the only rebutting evidence was the testimony of Wood.

■ The ruling on the general grounds in this division applies to the appeals of both Swift & Company and Wood. The evidence did not show that the deceased was guilty of such negligence as to bar a recovery in the case. The deceased parked his automobile 6 feet 9 inches from the center line of the 18-foot-wide paved portion of the road at a place where the narrow shoulder would not permit of parking a greater distance from the center line and to jack up the right rear wheel to fix a flat tire. The evidence showed that the deceased was standing either just to the rear of his car just back of the left rear light, or just beside his car on the pavement. The right front fender of the Swift car grazed the left rear fender of deceased's car and touched it nowhere else, and picked up deceased with its bumper and right fender and light. The evidence did not demand the finding that the deceased was so negligent as to bar a recovery on either or all of the theories advanced: (1) That there was a truck parked off the pavement on the opposite side of the road from deceased's car; (2) that deceased was guilty of negligence per se in parking as he did because he was familiar with the road and should have known that there were places within yards of him where he could have pulled completely off the highway; (3) that deceased was guilty of a failure to exercise ordinary care for his own safety; and (4) that deceased should have discovered and avoided the negligence of the defendants in the exercise of ordinary care. *Miller* v. *Rowland,* 86 *Ga. App.* 528 (71 S. E. 2d 556). Even if both Wood and deceased were guilty of negligence per se, there was the question of which was the more negligent.

■ We think the verdict of $80,000 was excessive. The plaintiff testified that she and the deceased were married in 1938 and·

that during the years 1938, 1939 and 1940 they farmed and the deceased worked part-time on Saturdays and before holidays in a grocery store; that in 1941 he was employed as manager of a grocery store; that he later was employed as manager of a furniture store; that in 1953 he was employed as a used-car salesman and was so employed at the time of his death; and that during this last employment, the deceased's income was $25 per week. The maximum salary that the deceased made during this entire period amounted to approximately $3,600 a year. The deceased was 38 years old at the time of his death. The plaintiff sued for the value of her husband's life based on an annual earning of $3,600 a year and a life expectancy of 28.96 years. The plaintiff introduced in evidence Carlisle's Mortality Table. While a jury have latitude in determining the value of a person's life in considering income, health, life expectancy, etc., and are not bound by mortality tables which may be introduced in evidence (*Standard Oil Co.* v. *Reagan*, 15 *Ga. App.* 571, 589, 84 S. E. 69), and may reduce the value of a person's life to its present cash value by any method satisfactory to them which produces a definite result that is fair and reasonable and is authorized by the evidence (*Central of Ga. Ry. Co.* v. *Keating*, 45 *Ga. App.* 811 (11), 165 S. E. 873), their final finding as to the present cash value of the decedent's life must be fair and within reason and adjusted to the evidence within the latitudes above mentioned. While Carlisle's Mortality Table and the table of annuities based on that mortality table contained in 70 *Ga.* 845, 847 are not conclusive, as stated above, they are nevertheless representative and may be used as a reasonable criterion. According to such tables, at age 38 and with an income of $3,600 per year, the gross value of the decedent's life would have been $104,256, which reduced to present value at seven per cent, would amount to $39,718.80. If the jury had added ten years expectancy to the decedent's life as shown by Carlisle's Mortality Table, giving the decedent a life expectancy of 38.59 years and an income of $3,600 per year, the gross value of the deceased's life would have amounted to $139,534.00 which would be reduced to the present value of $43,333.20. According to these representative tables, in order for the jury to have found a present value of $80,000, the de-

cedent would have had to have had a life expectancy of 38.59 years with a yearly income of $6,646.17, with a gross life-value of $263,075.69. While a jury might be authorized to find that the decedent had a life expectancy of ten years longer than that set out in Carlisle's Mortality Table, we do not think that the evidence authorized the finding that the decedent's income or potential would average over $6,600 per year during that life expectancy. Rather than showing that the deceased's earnings were increasing, the evidence showed that his earnings had dropped in that from April, 1952, until his death in February, 1954, his earnings were $25 per week or $1,200 per year. Nor do we think the evidence authorized a finding of any combination of expectancy and income which would authorize a finding that the deceased's life reduced to present value was $80,000. See *Western & A. R. Co.* v. *Wright,* 79 *Ga. App.* 733, 741 (9) (54 S. E. 2d 655).

What we have stated above with reference to the general grounds of Swift & Company's motion for a new trial applies to the motion of Swift & Company for a judgment notwithstanding the verdict.

In Case No. 36411, in which Swift & Company is plaintiff in error, the court did not err in denying Swift & Company's motion for new trial in the matter of the jurisdiction of the court over Swift & Company; the court did not err in overruling the general and special demurrers of Swift & Company to the petition; the court did not err in denying the motion of Swift & Company for a judgment notwithstanding the verdict; the court did not err in overruling the general grounds of the motion for a new trial filed by Swift and Company; the court erred in overruling special grounds one, two and five of the amended motion for new trial filed by Swift & Company.

In Case No. 36412 in which Elmer Hailey Wood is plaintiff in error, the court did not err in overruling the general grounds of the motion for a new trial filed by Elmer Hailey Wood; the court erred in overruling special ground one of the amended motion for a new trial filed by Elmer Hailey Wood.

*Judgments reversed in part and affirmed in part. Quillian and Nichols, JJ., concur.*