40740. HOSPITAL AUTHORITY OF HALL COUNTY AND CITY OF GAINESVILLE v. ADAMS.

Decided November 25, 1964—Rehearing denied
December 8, 1964 and December 17, 1964.

*Troutman, Sams, Schroder & Lockerman, Whelchel, Dunlap & Gignilliat, James A. Dunlap, Harben & Harben, Sam A. Harben, Jr.,* for plaintiff in error.

*Telford, Wayne & Greer, Joe K. Telford, C. Dent Bostick,* contra.

*F. M. Bird, Trammell E. Vickery,* for party at interest not party to record.

PANNELL, Judge. Mrs. Vera Adams, as plaintiff, brought an action against the Hospital Authority of Hall County and the City of Gainesville seeking to recover the full value of the life of her husband, Garland Adams, who died as a result of injuries received while a patient in the defendant hospital. Upon the trial of the case, the jury returned a verdict in favor of the plaintiff in the sum of $115,000. The defendant filed a motion for judgment notwithstanding the verdict and a motion for new trial on the general grounds and four special grounds. All of the special grounds were exceptions to charges of the court except one in which it was contended that the verdict was excessive and was the result of prejudice, bias, or gross mistake. Only Headnotes 1 and 5 require elaboration.

Upon the trial of the case, the evidence showed that the plaintiff's husband entered the defendant hospital on September 26, 1962, for examination and treatment, and that while a patient he received a retrograde pyelogram (an examination of the kidneys without an incision by the insertion of an illuminating device in the tube that drains the bladder). He was administered various drugs, prior to this examination and afterward, including sodium pentothal, demerol and atropine. While he was still in an apparently sleepy, tired and dazed condition, and still under the influence of said drugs, although able to intelligently respond to questions and in control of his mental faculties, he was carried on a stretcher to the X-ray room in the defendant hospital upon instructions from his physician. He was able to move from his bed to the stretcher to be carried to the X-ray room by inching very slowly on his side and was able to move from the stretcher to the X-ray table in the same manner. There were two technicians in the X-ray room, and they testified that he followed instructions for the taking of the pictures, and that after the pictures were taken he informed them that he was nauseated. They both left the room for four or five minutes, and upon re-entering the room heard groans and one of them thought the patient had gone to the bathroom and was vomiting. They discovered the patient, however, lying on his stomach on the floor behind the X-ray table and near a window with his foot wedged beneath the radiator and his head in the opposite

direction from where he lay on the X-ray table. The requisition from the physician, directing the taking of X-ray pictures, did not indicate that the patient needed someone with him constantly. The technicians testified that 90 percent of the patients brought to the X-ray room complained of nausea and that this complaint was not unusual. There was ample testimony regarding the effect of the various drugs on the ability of a patient to control his movements and that they affected the ability to move or stabilize his movements. One doctor testified that, in his opinion, a patient of the age and size of the deceased who had such drugs administered to him as testified, did not think it would be a wise policy to leave such a patient unattended on an X-ray table. There was testimony that the procedure followed with the deceased in the present case was common procedure in other hospitals, that is, that unless the attending physician indicates on the requisition blank for the X-ray pictures the necessity for special care, no special care is given. Much is said in the briefs of both parties, particularly that of the plaintiff in error, in attempting to demonstrate that the effect of the drugs would or would not cause the deceased to fall off the X-ray table. As we see the case, it was not necessary for the jury to find that the deceased fell off the X-ray table because of the effect of the drugs. The jury was authorized to find that the deceased fell after getting off the table in order to go to the bathroom because of his nausea, and then fell because of the effect of the drugs. The question is thus presented as to whether the two technicians in attendance and employees of the defendant hospital, should have foreseen that the defendant, because of his nausea, would attempt to go to the bathroom and should have foreseen that the defendant would likely injure himself in so doing because of the effect of the drugs.

A private hospital is under the duty to exercise such reasonable care in looking after and protecting a patient as the patient's condition which is known to the hospital through its agents and servants charged with the duty of looking after and supervising the patient may require. This duty extends to safeguarding and protecting the patient from any known or reasonably apprehended danger from himself which may be due to

his condition, and to use ordinary and reasonable care to prevent it. *Emory University v. Shadburn,* 47 Ga. App. 643 (171 SE 192). See also, *Tate v. McCall Hospital,* 57 Ga. App. 824 (196 SE 906); *Piedmont Hospital v. Anderson,* 65 Ga. App. 491 (3) (16 SE2d 90); *Stansfield v. Gardner,* 56 Ga. App. 634, 643 (193 SE 375). Whether or not the two technicians in the X-ray room should have reasonably apprehended the occurrence which took place during their absence is a matter for the jury. That a jury could find that they should have reasonably apprehended danger is borne out by the fact that one of the technicians, upon seeing the X-ray table empty and hearing groans, immediately thought that the deceased had gotten off the table and gone to the bathroom to relieve his nausea. That this is the first thing that occurred to her is an excellent indication that she should have reasonably apprehended the same. While a hospital is not required to exercise medical skill, *Porter v. Patterson,* 107 Ga. App. 64 (129 SE2d 70), yet, a hospital, by its very nature, holds itself out as competent, through its employees, to care for the sick and the injured with more knowledge and skill than that ordinarily required by others. In our opinion, the evidence, while by no means strong and conclusive and not demanding a verdict for either party, was sufficient to authorize a verdict in favor of the plaintiff.

This ruling in this case is not intended to mean, and should not be construed to mean, that a mere failure by a hospital to furnish a constant attendant to a patient constitutes negligence, or that the ruling herein made means that a "one-patient-one-attendant" rule is declared to be the law of this State, the contention of the plaintiff in error to the contrary notwithstanding.

The evidence for the plaintiff widow showed that the deceased earned the following salary and bonus in the respective years prior to his death: November, 1959, salary—$6,965.38, bonus—$2,108.48; 1960, salary—$6,625.00, bonus—$4,715.27; nine months of 1962, salary—$5,875.00, bonus—$5,328.00. The salary portion of his earnings alone, without consideration of the bonuses, show that his earnings in 1962 were an increase over 1959 and 1960. This would have authorized the jury to find the probability of increased earning capacity. Using the earn-

ing capacity for the nine months of 1962, as to salary only, as a criterion, and using the mortality tables introduced in evidence showing a life expectancy of 23.08 years and applying the method of computation based on such earnings as set forth in *Atlanta, Birmingham &c. R. Co. v. Thomas,* 64 Ga. App. 253, 255 (5) (12 SE2d 494) and applying the same to an annual salary of $7,833.24 per year (the nine months salary of 1962 projected for an additional three months) we arrive at a present cash value of the life of the deceased of $111,809.55. The verdict was less than four percent in excess of this amount. In view of all the evidence, including the fact that the deceased's earning capacity was greater in 1962, the year of his death, than it was in 1959 and 1960 and that he was only 47 years of age at the time of his death, we cannot say that the amount found by the jury was unauthorized or so excessive as to indicate bias and prejudice. In *Swift & Co. v. Lawson,* 95 Ga. App. 35 (97 SE2d 168) the amount found by the jury was almost 100 percent in excess of the amount authorized by the most favorable construction of the evidence as to earning capacity after almost doubling this capacity and almost doubling the life expectancy. It was clear in that case that the amount arrived at by the jury could not possibly have been arrived at by a fair and proper construction of the evidence or upon any theory whatsoever.

The trial court did not err in overruling the motion of the defendant for a judgment notwithstanding the verdict, or in overruling the defendant's motion for new trial.

*Judgment affirmed. Frankum, J., concurs. Felton, C. J., concurs specially.*

FELTON, Chief Judge, concurring specially as to the ruling in Division 3 of the opinion. I concur specially in the ruling in Division 3 of the opinion for the sole reason that a majority of the Court of Appeals, acting as a whole court, made the same ruling as to a charge similar in principle to the one here complained of in *Georgia Hydratane Gas, Inc. v. White,* 110 Ga. App. 826, in the absence of which I would have dissented from Division 3 in principle for the same reasons I advanced in my dissent in the above cited case.