42238. THOMPSON v. HOSPITAL AUTHORITY OF UPSON COUNTY.

ARGUED SEPTEMBER 8, 1966—DECIDED SEPTEMBER 22, 1966.

*H. Thad Crawley, Harry A. Crawley,* for appellant.

*Beck, Goddard, Owen & Smalley, Robert H. Smalley, Jr.,* for appellee.

FELTON, Chief Judge. It has been established by several decisions that in a case such as the present one the plaintiff must show either that the patient's physician ordered side rails in a manner binding upon the hospital or that, prior to the fall, the patient was in a semi-conscious state, or under the influence of drugs, such as to cause the employees of the hospital to reasonably apprehend that the patient's condition required the constant attendance of a nurse or other employee and/or the putting up of the side rails on the bed. See *Exec. Comm. of Baptist Convention v. Ferguson,* 95 Ga. App. 393 (98 SE2d 50), reversed on technical grounds, 213 Ga. 441 (99 SE2d 150), conformed to, 96 Ga. App. 316 (99 SE2d 835); *Wills v. Emory University,* 94 Ga. App. 734 (96 SE2d 220); *Hospital Authority &c. v. Adams,* 110 Ga. App. 848 (140 SE2d 139).

There was no evidence that the plaintiff's physician had ordered either the side rails on her bed pulled up into place or constant attendance upon the plaintiff by the defendant's em-

ployees. To make a prima facie case, then, the evidence must have authorized a finding that the above measures were required of the defendant from a reasonable apprehension of the plaintiff's condition.

The evidence showed that the plaintiff had been admitted to this same hospital several times over a period of years, for other causes as well as the migraine headaches. Although she testified that she had had side rails before, it does not appear that they were used during her confinements for the migraine headache treatments. Her chart for the confinement here involved and her own testimony show that she was an ambulatory patient and could get out of bed anytime she needed or wanted to. She testified that it took 5 or 10 minutes for the shots to take effect, after which she not only was able to, but actually did on occasion, get out of bed. In spite of her testimony that she thought she should have had the side rails up and that all it took to put them into place was to lift them up, she neither pulled them up herself, either from the bed or when getting in or out of bed, nor mentioned to her physician or any of defendant's employees her feeling that the rails were needed. She further testified that defendant's employees had, as far as she knew, properly and courteously carried out all the doctor's orders and that they came every time she buzzed for them. Under these described circumstances, without more, there would be no apparent need for constant attendance upon the plaintiff, and the use of the side rails would not only have been unnecessary, but would have impeded her in getting in and out of bed at will.

The evidence as to the times and sequence of events before and after the alleged fall is somewhat confusing and apparently conflicting. We say "alleged" fall because there is no direct evidence that there even was such a fall or, if so, at what time it occurred, except for the testimony of the plaintiff. Neither of the two nurses who supposedly helped her back into bed after the fall was called as a witness to corroborate the plaintiff's testimony, and her chart, introduced in evidence, contained no notation of a fall, although other detailed data were there noted. Although two witnesses, who saw the plaintiff later on during the day in which the alleged early morning fall occurred, testified that she had extensive bruises on her lower back and legs

at that time, there is no evidence as to the absence of such bruises at any time prior thereto. The evidence that the side rails were not used even during the remaining 6 days of the plaintiff's confinement subsequent to the alleged fall would seem either to put into serious question the fact of the occurrence of the fall altogether or to indicate negligence on the part of all concerned, including the plaintiff. The plaintiff's testimony as to what happened is understandably vague, since she was alternately awake and asleep and suffering pain throughout the night. Although she testified that she was given a shot at 1 or 1:30 a.m., her chart not only does not show any medication administered during that time, but indicates that she was quiet and apparently sleeping then. Even if she did receive a shot at that time, however, she testified that she was still conscious of everything that was going on, even though she may have "dozed off" for awhile. The petition alleges that the fall occurred at 2 a.m., but the plaintiff testified that it was sometime after 2:30 a.m., because she noticed that her watch showed 3 o'clock after she had been put back into bed. She testified that the nurses performed a catheterization upon her immediately after her fall, yet the nurse's chart indicates that this was done at around 5 a.m. Her chart indicates that as late as 2 a.m. the plaintiff was able to get up from bed and go into the bathroom.

Although there are notations on the chart that the plaintiff was complaining of a headache between 2 and 2:30 a.m., and that various named drugs were given her during that time and 2:40 a.m., this still is not sufficient to show defendant's negligence in not taking the above-mentioned precautions. There was no medical evidence as to the general effect of such drugs or their probable or previous effect upon the plaintiff, as there was in the case of *Hospital Authority &c. v. Adams,* 110 Ga. App. 848, supra, p. 852. The plaintiff's testimony that she felt dizzy after being given a shot shortly after entering the hospital is not corroborated by any medical evidence that the shot was the cause of her dizziness, nor is it shown that the drugs given her on the morning of her alleged fall were the same type which supposedly caused her previous dizziness. Furthermore, it was not shown that any such alleged side effects were known by the defendant or its agents. Since the plaintiff had received similar treatment

for this same complaint not only for a day and a half prior to the alleged fall but also for several years, it can be assumed that both she and the defendant probably would have been aware of such side effects if they existed. The evidence is just as consistent with the theory that the plaintiff's dizziness and drowsiness were caused by her migraine headache and the natural effects of confinement to bed and deprivation of adequate sleep as it is with the theory that the drugs caused such symptoms, in the absence of affirmative medical evidence.

A verdict for the plaintiff would have had to be based upon speculation under the evidence adduced; therefore, the court did not err in its judgment granting the nonsuit.

*Judgment affirmed. Frankum and Pannell, JJ., concur.*