## 76287. BROOKS v. COLISEUM PARK HOSPITAL, INC.
(369 SE2d 319)

BIRDSONG, Chief Judge.

This is an appeal from judgment entered on a jury verdict for the defendant, Coliseum Park Hospital, Inc., d/b/a Coliseum Psychiatric Hospital, in a medical malpractice action in which Mrs. Lucille M. Sterling, through her guardian, sought damages from the hospital, alleging that the hospital was negligent in not placing side rails on her bed, and in not having an attendant with her, and that because of

such alleged negligence, Mrs. Sterling fell and broke her hip. An amended complaint also sought damages for the alleged negligent act of the hospital in failing to provide assistance to Mrs. Sterling in feeding herself, and claiming that because of such failure, she spilled her food and burned her thigh.

On June 20, 1984, Mrs. Sterling was admitted to the Coliseum Psychiatric Hospital, and shortly thereafter was transferred to its Special Care Unit for evaluation and treatment. She was 69 years old and suffering from Alzheimer's disease. She had "severe mood swings," experienced delusions and hallucinations, and had refused to eat or take her medication. Mrs. Sterling's daughter and another friend advised hospital personnel that Mrs. Sterling had been sleeping in a hospital bed at home, with side rails. When they visited her at the hospital, Mrs. Sterling was found wandering around the hospital, and sleeping in other people's beds. Mrs. Sterling's daughter said her mother "basically [was] very confused" and felt more secure in a bed with side rails, and she requested the hospital provide side rails for her mother. During one visit the daughter saw a burn on her mother's thigh, which looked as if it had not been treated and brought it to the attention of the hospital's staff.

At 3:00 a.m. on the morning of July 29, 1984, Mrs. Sterling had been restless that night and the nurse on duty gave her Dalmane, a "hypnotic agent" to assist her in sleeping. Some side-effects of Dalmane are "nocturnal confusion," "restlessness," and "difficulty in walking. . . ." However, these are also the same symptoms exhibited by persons with Alzheimer's disease.

Gregory Land, a psychiatric technician, in the hospital's Special Care Unit, was on duty the morning of July 29, and had seen Mrs. Sterling several times before 4:15 a.m. He was at his desk, completing paperwork, when he heard a noise and saw Mrs. Sterling "was out of bed and walking unevenly toward the door of her room, and within a few steps she ran into the door frame of the door and then fell to the floor." He was aware that the nurse had given Mrs. Sterling Dalmane at 3:00 a.m., and when he saw her, he began to stand up, but he could not get to her before she walked into the door frame. It was only "seconds" before he got to her, checked her briefly, and returned her to her bed where Nurse Brittain checked her and found nothing obviously wrong. There was no apparent injury.

However, x-rays revealed "a base-of-the-neck fracture" of her hip which required a "hip-nailing" device be placed over the area of the fracture. The device used to stabilize the fracture is called a "Ken nail." In September, 1984, x-rays showed "healing was complete" and Mrs. Sterling was discharged from medical treatment for her broken hip. Later, infection manifested itself in the hip and the area where the "Ken nail" had been implanted had to be opened and drained.

Finally another operation was required to remove the old Ken nail, cleanse the area, and implant a new Ken nail.

Dr. Jimmy Asbell, testifying for the plaintiff, was of the opinion that the infection could have been implanted at the first operation, or that Mrs. Sterling "herself could have seeded a bacteria to this area where the implant was." On cross-examination, the doctor testified that he would not state with any "reasonable medical certainty that this bacteria was introduced as a result of the fracture or the surgery to repair the fracture. . . ."

Nancy R. Murphy, a registered nurse, graduate of St. Clair's Hospital School of Nursing, also has a BS from Southwest Texas State University, a Master of Education from Mississippi State, and a Juris Doctor degree from Woodrow Wilson College of Law, who is now working as a lawyer, and has appeared as an expert witness for the prosecution in six cases, is of the opinion that "since there were no side rails on the bed, her [Mrs. Sterling's] safety was compromised." In her opinion, "the placing of side rails [is] a matter of a nursing decision . . ." and a physician is not required for a nurse to place side rails on a patient's bed. Ms. Murphy was aware of Coliseum's Psychiatric Hospital Policies and Procedures Manual, which stated that "[i]ndications for the use of side rails include, but are not necessarily limited to, (1) 65 years of age or above; (2) requiring restraints; (3) difficulty raising self up in bed, and (4) restless sleeping habits." Ms. Murphy admitted that if Mrs. Sterling's personal physician was of the opinion that side rails would make the patient less safe, she would change her opinion.

Mrs. Sterling's personal doctor, Dr. Ray H. McCard, a physician and a psychiatrist, testified that he was contacted by her family and he recommended Mrs. Sterling be admitted to the Coliseum Psychiatric Hospital's Special Care Unit. The special care unit was "closed" so that patients could not leave, and the patient received more supervision and care. He diagnosed Mrs. Sterling as suffering from Alzheimer's disease, which is also called "organic brain syndrome . . . sort of a deterioration . . . she had a lot of hardening of the arteries and narrowing of the blood vessels going to her brain . . . leading to the cerebral atrophy. . . ." She was severely disturbed mentally and had physical problems. She had paranoid delusions and thought someone was trying to hurt her. The doctor was aware that the hospital was not using side rails, but the beds in the psychiatric unit are closer to the floor and lower than a regular hospital bed. Side rails can be added to the bed, if desired. Dr. McCard was asked: "Q. Did you feel at any time that side rails were appropriate and should have been added to that bed? A. No, I did not . . . a philosophy has gradually evolved over a period of time concerning side rails, and side rails in older confused individuals can be quite dangerous because, in a con-

fused state, older people will try to get out of bed, and by trying to get out of bed, they, of course, are not recognizing the danger associated with what they're doing, and they will crawl over the side rails, which increases the length — the distance a person can fall . . . the philosophy now is that if you put up side rails in [sic] a person who is confused . . . then you should put some form of restraint of them. . . . So we did not utilize side rails, which, in turn, would have also warranted the use of some type of restraint. . . ."

Dr. McCard stated that in dealing with an individual with Alzheimer's, such as Mrs. Sterling, because she had osteoporosis, "which means fragile bones," and had three compression fractures of her spine, they did not want to keep her restrained, "which would have been safe . . . but would not have been for her best interest . . . we did not want to aggravate her by tying her down . . ." which would have been required if side rails had been put on the bed. He did not think Mrs. Sterling would "acknowledge the significance of the side rails" and could have injured herself in attempting to get out of bed. He attempted "to create the most therapeutic situation for her" and had prescribed other medication, and could have ordered the side rails, but he would not order restraint as Mrs. Sterling "usually could walk steadily enough that you didn't worry about — about her being up and on the unit. . . ." In his opinion, the hospital, by and through its staff, exercised that degree of skill, care and diligence generally exercised under similar conditions and like circumstances. Dr. McCard was aware of the burn suffered by Mrs. Sterling, and that she received treatment for the burn when ice was placed on the burn area and Furacin ointment was then applied. He was of the opinion that good medical practice was followed by the hospital in the treatment of the burn.

Lita M. Holder, an RN, who has a master's degree in Psychiatric Nursing from the Medical College of Georgia, and a doctorate in education from the University of Georgia, found Mrs. Sterling to be suffering from Alzheimer's — very confused, had delusions and hallucinations, and physically, had "angina . . . Raynaud's Disease . . . osteoporosis and a hiatel hernia. . . ." She stated that psychiatric nursing's goal was "to always try to help the client reach their maximum level of functioning." Lang stated that they encouraged the patients to feed themselves, but sometimes they needed help. Mrs. Sterling had "good days and bad days." She was able to walk around the unit by herself, and would feed herself "on occasions." Lang encouraged Mrs. Sterling to feed herself.

The jury found for the appellee hospital and judgment was entered on the verdict. Appellant has filed this appeal. *Held*:

1. Appellant requested the trial court to charge "that the plaintiff must show that, prior to the fall, she was in a semi-conscious

state, or under the influence of drugs, such as to cause the employees of the hospital to reasonably apprehend that the patient's condition required the constant attendance of a nurse or other employee and/or the putting up of the side rails on the bed." This request was denied and the denial is enumerated as error.

The respective positions of the parties at trial were that appellant contended the nurses had the authority to put up side rails under the hospital's policy and procedure guidelines, and should have installed the rails because of the mental and physical condition of Mrs. Sterling; and the hospital established that the patient's personal physician was primarily responsible for the care and treatment of the patient, and Mrs. Sterling's personal physician not only had not requested side rails, but was opposed to them.

Appellant's personal physician, Dr. McCard, testified that the hospital nurses performed an important function in the care and treatment of patients, but they were "carrying out the directions and orders of the physician who ultimately has the responsibility for the patient." And, in this instance, the patient's personal physician was against the use of side rails for an elderly patient with Alzheimer's disease, because of her mental confusion and possibility of injury if she attempted to climb over the side rails.

" ' "A private hospital is under the duty to exercise such reasonable care in looking after and protecting a patient as the patient's condition which is known to the hospital through its agents and servants charged with the duty of looking after and supervising the patient may require. This duty extends to safeguarding and protecting the patient from any known or reasonably apprehended danger from himself which may be due to his condition, and to use ordinary and reasonable care to prevent it." ' " *Johnson v. Parnes*, 163 Ga. App. 404, 405 (294 SE2d 624); accord *Allrid v. Emory Univ.*, 249 Ga. 35, 41 (285 SE2d 521); *Doctors Hosp. of Augusta v. Poole*, 144 Ga. App. 184 (1) (241 SE2d 2); *Hospital Auth. &c. v. Adams*, 110 Ga. App. 848, 852 (140 SE2d 139). Further, " '[t]he mere failure by a hospital to furnish a constant attendant to a patient does not constitute negligence. It is not the law of this state that one patient is entitled to one attendant at all times. However, a hospital is under the duty to exercise such reasonable care in looking after and protecting a patient as to the patient[']s condition known through its agent charged [with] the duty of looking after and supervising the patient may require [sic].' " *Cobb County &c. Hosp. Auth. v. Crumbley*, 179 Ga. App. 896, 897 (348 SE2d 49). The mere fact of injury does not give rise to a presumption or inference of negligence, because negligence is not to be presumed, but is a matter for affirmative proof. *Housing Auth. of Atlanta v. Famble*, 170 Ga. App. 509, 524 (317 SE2d 853). And, in the absence of affirmative proof of negligence, we must presume there was a per-

formance of duty and freedom from negligence. *Orkin Exterminating Co. v. Stevens*, 130 Ga. App. 363, 368 (203 SE2d 587).

The charge given by the trial court was full and fair, adjusted to the facts of this case, and adequately covered the issues presented. It is not error to refuse to give a requested charge when the jury is accurately and fully charged on the relevant law for the issue covered by the requested charge. *Ponder v. Ponder*, 251 Ga. 323 (3) (304 SE2d 61); *Freeman v. Saxton*, 243 Ga. 571, 573 (255 SE2d 28); *Continental Cas. Co. v. Union Camp Corp.*, 230 Ga. 8, 18 (3) (195 SE2d 417); *Green v. Gaydon*, 174 Ga. App. 796, 798 (331 SE2d 106). This enumeration is without merit.

2. At the close of the evidence, appellant moved for a directed verdict on the issue of the hospital's liability for the burn on Mrs. Sterling's thigh. The motion was denied and the question submitted to the jury. Mrs. Sterling's personal physician stated that he had attempted "to create the most therapeutic situation" for her. And, Ms. Holder, the psychiatric nursing expert, testified that psychiatric nursing's goal was "to always try to help the [patient] reach the maximum level of functioning." To that end, the psychiatric technician, Lang, encouraged Mrs. Sterling to feed herself, that she had "good days and bad days," and on occasion she could feed herself. However, the injury occurred.

As stated above, the mere fact that an injury occurred is not dispositive on an issue of negligence, for negligence is not to be presumed, but is a matter of affirmative proof. *Famble*, supra at 524. Except in plain, palpable, and indisputable cases, questions of negligence are solely for jury determination. *Johnson*, supra at 405. Hence, unless no other conclusion is permissible, questions of negligence are matters for jury resolution. *Cowart v. Five Star Mobile Homes*, 161 Ga. App. 278, 279 (291 SE2d 13); *Epps Air Svc. v. DeKalb County*, 147 Ga. App. 195 (1) (248 SE2d 300). The evidence did not demand a finding that the hospital's actionable negligence was the cause of the injury. Thus, the trial court did not err in denying appellant's motion for directed verdict.

*Judgment affirmed. Banke, P. J., and Beasley, J., concur.*

DECIDED MAY 2, 1988.

*John A. Draughon, Edward S. Sell III*, for appellant.
*R. William Buzzell II, Susan S. Cole*, for appellee.