69 So.2d 776 (1954)
LITHGOW
v.
HAMILTON et al. (three cases).
Supreme Court of Florida, Special Division A.
January 15, 1954.
Rehearing Denied February 13, 1954.
*777 Blackwell, Walker & Gray, Miami, for appellant.
Nichols, Gaither, Green, Frates & Beckham, Miami, for appellees.
SEBRING, Justice.
On August 31, 1951, at the intersection of North Miami Avenue and 119th Street in Miami, Florida, Mrs. Thomas Lee Hamilton was killed, and her 4-year old son was injured, when an ambulance belonging to David Lithgow Funeral Centers collided with an automobile that Mrs. Hamilton was driving and in which the minor son was riding as a passenger. Thomas Lee Hamilton, the father, brought suit, as next friend of his minor son, to recover damages for personal injuries to the child. He brought a second suit to recover for consequential damages to himself resulting from his minor son's personal injuries. He instituted a third suit to recover damages for the wrongful death of his wife. The cases were consolidated for trial and tried together. At the conclusion of the trial the jury returned three separate verdicts, as follows: A verdict in favor of the plaintiff father, as next friend of the minor son, in the amount of $3,750; a verdict in favor of the plaintiff for consequential damages from injuries to his minor son, in the amount of $1,000; a verdict in favor of the plaintiff for the wrongful death of his wife, in the amount of $100,000. Judgments were rendered upon the verdicts and the defendant appealed.
It appears from the record that on the morning of August 31, 1951, the 54th Street Funeral Center of the defendant received a request by telephone to send an ambulance to N.W. 138th Street to pick up and take to the hospital a small child who had swallowed some foreign substance. An ambulance was immediately dispatched on the mission. After the ambulance left the garage of the Funeral Center it traveled west on 54th Street to N.E. 2d Avenue, north on N.E. 2nd Avenue to where it terminates by curving west into 119th Street, and then proceeded west on 119th Street to its intersection with Miami Avenue, where it ran into the plaintiff's car which was proceeding across the intersection in a southerly direction.
The evidence as to what transpired at and immediately prior to the collision is in conflict. But there is evidence, which the jury had the right to believe, that 119th Street and Miami Avenue were heavily travelled thoroughfares. As Mrs. Hamilton approached the intersection she was driving in the proper lane of Miami Avenue for southbound traffic. She proceeded into the intersection while the light was green at a speed estimated by some of the witnesses as "very slow" and by others as 15 to 20 miles an hour. The highest estimate of speed given by any of the plaintiff's witnesses was that she was travelling "from 20 to 30 miles an hour." As to the speed of the defendant's ambulance, there was testimony that as it approached the intersection, it was being driven at "a teriffic rate of speed * * * between 60 and 65 miles an hour." Other testimony placed the estimated speed at between 45 to 60 miles an hour. Many of the witnesses agreed that as the ambulance approached the intersection the siren was not blowing  at least until the moment before impact; that the driver ran the red light; and that he either accelerated speed, or failed to *778 slow down, as he approached the intersection.
From the evidence before it the jury had the right to conclude that the driver of the ambulance ran through a red light at a busy intersection going at least 45 miles an hour without blowing his siren or giving other reasonable warning of his approach and struck the car occupied by Mrs. Hamilton and her son that was then and there being driven through a green light at a lawful rate of speed. We hold, therefore, that a case warranting recovery was established by the evidence and that the trial court did not commit reversible error in failing to direct a verdict upon motion of the defendant.
Objections are made by the defendant as to the amount of the verdict that was returned in favor of the plaintiff for the wrongful death of his wife. It is contended that the verdict of $100,000 was so grossly excessive as to create a presumption that it was a result of passion, prejudice, sympathy or some other extraneous factor, rather than a fair and impartial rationalization of the evidence in the cause. The statute under which the action was brought requires the jury to award such damages "as the party * * * entitled to sue may have sustained by reason of the death of the party killed * * *." Section 768.02, Florida Statutes 1951, F.S.A. Where the suit is by the husband for the wrongful death of the wife it seems well settled that among the elements which the jury is entitled to take into consideration in fixing the amount of the award are the following: (1) The funeral expenses of the wife incurred and paid by the husband, where the amount thereof is claimed as special damages. City of Coral Gables v. Neill, 133 Fla. 4, 182 So. 432; Potts v. Mulligan, 141 Fla. 685, 193 So. 767. (2) The pecuniary value of services which the husband might reasonably expect to have received from the deceased wife if she had not been killed, less maintenance costs, of course; this includes the value of such services as the wife was accustomed to perform in the household and which will have to be replaced by hiring services; services ordinarily performed by the deceased wife in the care and moral training of the minor children in the household; and any special service which the wife was accustomed to perform for the husband in the household, and in his business without compensation, which will have to be replaced by hired services. Vol. 5, Sutherland on Damages, 4th Ed., sec. 1266; 25 C.J.S., Death, § 103(b); Pollard v. Kent, 59 Ga. App. 118, 200 S.E. 542; Blue's Truck Line v. Harwell, 57 Ga. App. 136, 194 S.E. 399; Baker v. Salvation Army, 91 N.H. 1, 12 A.2d 514; Herro v. North Western Malleable Iron Co., 181 Wis. 198, 194 N.W. 383. Compare Seaboard Airline R. Co. v. Martin, Fla., 56 So.2d 509; Waller v. First Savings & Trust Co., 103 Fla. 1025, 138 So. 780; Ripley v. Ewell, Fla., 61 So.2d 420. (3) The husband's loss of the wife's consortium and companionship, by which is meant, the conjugal fellowship of husband and wife and the right of each to the company, cooperation and aid of the other in every conjugal relation. Potts v. Mulligan, supra; Florida Cent. & P.R. Co. v. Foxworth, 41 Fla. 1, 25 So. 338. Consortium means much more than mere sexual relation and consists, also, of that affection, solace, comfort, companionship, conjugal life, fellowship, society and assistance so necessary to a successful marriage. Florida Cent. & P.R. Co. v. Foxworth, supra.
In recognition of these elements, the plaintiff introduced evidence that at the time of death the joint life expectancy of the parties was 26 years. There was evidence that prior to her death Mrs. Hamilton was a hard working wife, in exceedingly good health, who did all the housework, the laundry, and the cooking for the family. During the 16-year period of the marriage of the parties they were constantly together, except for the time that the husband was in the Army. In speaking of the relationship the plaintiff asserted: "We got along well. We understood each other; we loved each other; we had each other and our child. We figured we had everything on earth that a man can have. * * * My wife was a wife, a housekeeper, and a *779 mother for the child, and a firm partner. We shared everything, and shared it alike. What little money we had and made was banked together in a joint bank account. Everything we owned was jointly. Every deal that I had undertaken, she was right there to help me in every way she could. * * * She helped me with such as payrolls [while I was in contracting work], and she ran errands, such as assisting me in getting materials when materials was hard to get, and going to and from the bank for me and making out payrolls, and things of that nature. * * * She made [the child's] clothes, provided his food, and all the care that goes with taking care of a child. She did a swell job of it. At the time of her death she had clothes sufficient to last him about a year in advance  such as pajamas, undershirts, clothes  anything that a mother could make for the son, she had it made in advance."
The evidence is uncontroverted that prior to the death of the mother and injury to the son the child was in perfect physical condition and was a well-balanced child; that he was well behaved, well liked, and got along well with other children. As the result of the accident his personality has changed. He is highly nervous and easily disturbed, has frequent and persistent headaches, and doesn't get along well with other children. As one of the medical witnesses explained to the jury, the child has been so psychologically damaged as the result of the accident that he requires extra-special care, he "needs a warm environment; someone who can give him a mother's care over a 24-hour sort of period * * * [and also] a well trained child psychologist, or child psychiatrist, to see him two or three times a week in play therapy [for] a couple of years." He should have a complete neurological examination every six months for a period of several years until his condition improves.
Against this back drop of evidence, which was material not only as to the issue of loss of society, services and consortium, but also as to the question of what type of help would have to be obtained to look after the child and run the household while the plaintiff was attempting to make a living and keep the family together, the plaintiff called to the witness stand the ownermanager of a reputable employment service in Miami, and the following questions were asked, and answers given:
"Q. Mr. Brown, we have * * * the problem of the housekeeping and child care involving a five-year old child, and a father who works all day  that is, whose work requires him to be away; and of the maintaining of a * * * five room home, a furnished home, of course, where they lived before the wife was killed. Insofar as getting a housekeeper is concerned to keep house on the basis of keeping a home going, say 24 hours a day, including the care of the minor child, what, sir, in your opinion would be the reasonable cost of procuring such services of a suitable type? A. * * * you mean a housekeeper as well as a counsellor and guide for the youngster * * * where that housekeeper would live on the premises and be responsible for the child during the absence of the parents?
"Q. Yes sir, that is the problem we have before us. A. * * * the term given that individual is usually a combination of governess, counsellor and housekeeper. Those rates run around $250 per month, plus their complete maintenance, with the privilege of having one day off a week. * * * The caliber of that individual would have to be considerably above the housekeeper that we associate the term `housekeeper' with. That individual would have to be a guide to that child. If it is an impressionable age it would have to perhaps take the place of the fundamentals in schooling before it reaches school age, and it would have to act as its guardian  and in that case it would have to have a reasonable degree of education as well as aptitude for the work. * * *
"Q. That would be $250 a month plus the individual's board, lodging, *780 and meals? A. That is right * * * $125 would be the minimum [for maintenance]."
In addition to the testimony quoted above the witness testified that a combination governess, housekeeper and counsellor could not be expected to do the laundry and heavy housecleaning but that such services would have to be performed by a day worker hired for that specific service; that three days in each week would be required for washing, ironing and housecleaning and that $10 a day would be the reasonable cost of such a worker, including car fare and meals.
The defendant did not object to any of the evidence set out above. He did not cross-examine the witnesses who testified to the facts stated. He offered no evidence in rebuttal of the testimony given by the witnesses. So it is, that the only evidence that the jury had before it on the issue of damages was the uncontroverted evidence offered by the plaintiff. From this evidence the jury had the right to believe that a combination housekeeper-governess-counsellor would be needed on a 24-hour a day basis to look after the family and that the reasonable cost of a person competent to fill such a role would be $250 a month in addition to maintenance. They had the right to believe that such a person could not be expected to perform the menial tasks around the house, such as washing, ironing and heavy housecleaning, but that this job would have to be done by a servant hired for the purpose at an estimated cost of $30 a week. They had the right to believe that only by the presence of these two hired persons in the Hamilton home, at least for a considerable period in the future, could conditions as they existed in the home prior to the death of Mrs. Hamilton be approximated. They had the right to believe that the plaintiff had suffered the loss of comfort, society and consortium of an exceedingly high character as the result of the accident.
In the light of the uncontroverted evidence we find nothing in this record that would justify this Court in setting aside the verdict or ordering a remittitur on the ground that the jury was swayed by passion, prejudice or other improper motive. Florida Power & Light Co. v. Brinson, Fla., 1953, 67 So.2d 407; Miami Transit Co. v. Scott, Fla., 58 So.2d 542. Certainly we have no right to substitute our own personal notions of what would constitute a proper award for those of the jury. Margaret Ann Super Markets, Inc. v. Scholl, 159 Fla. 748, 34 So.2d 238.
Other questions argued by the appellant have been duly considered and are found to be without merit.
The appellant has failed to make reversible error appear and consequently the judgment appealed from should be affirmed.
It is so ordered.
TERRELL, Acting Chief Justice, MATHEWS, J., and PARKS, Associate Justice, concur.