The **PRUDENTIAL INSURANCE COMPANY OF AMERICA**, Appellant,

v.

Genevieve D. SCHREFFLER, Appellee.

No. 23315.

United States Court of Appeals
Fifth Circuit.

April 25, 1967.

Rehearing Denied June 8, 1967.

Carl K. Hoffmann, Dixon, DeJarnette, Bradford, Williams, McKay & Kimbrell, Miami, Fla., for appellant.

Cotton Howell, Richard M. Leslie, Shutts & Bowen, Miami, Fla., for appellee.

Before TUTTLE, Chief Judge, and BELL and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

Prudential appeals from a judgment entered in accordance with a jury verdict in favor of Genevieve Schreffler, beneficiary under the group life insurance policy on the life of Louden G. Schreffler, her husband. Mrs. Schreffler averred that her husband had died an accidental death and she claimed under the double indemnity provisions of the policy:

"'PART II. Accidental Death and Dismemberment Benefits.

If the Insured, while this Policy is in force, sustains an accidental bodily injury which results, *directly and independently of all other causes*, in the loss of life, sight or limb by such person within ninety days after the date such injury is sustained * * *

Exceptions and Reductions Applicable to Part II * * * For the purposes of this Part II, no loss shall be considered a loss due to accidental bodily injury if such loss is caused *or contributed to* by (1) bodily or mental infirmity or disease; or (2) any infection, other than a pyrogenic infection occurring through and at the time of an accidental cut or wound.'" [emphasis added]

Prudential argues here that the trial judge should have granted judgment notwithstanding the verdict because the jury could not have found from the evidence that the accident caused the death "directly and independently of all other causes." We walk the last mile to pay every heed to the jury's verdict, but we agree with Prudential and reverse.

The insured, Louden Schreffler, had suffered from asthma and pulmonary emphysema for the ten years preceding his death. Pulmonary emphysema is a chronic and progressive disease which destroys normal lung tissue and prevents transfer of oxygen to the bloodstream in usual amounts. From 1954 until his death in 1962, Schreffler was treated by Dr. Thomas D. White, his family physician.

On the morning of April 24, 1962, Schreffler (taking the view of the evidence most favorable to plaintiff) tripped and fell at home, breaking his hip. He was admitted to the hospital by Dr. White and underwent surgery to set the fracture. The surgeon was Dr. George Richards, who testified at trial. The surgery was successful, but following it Schreffler's lung condition worsened and he died on May 3.

■ The question of what circumstances justify the setting aside of a jury verdict, like other questions concerning the judge-jury relationship in the federal courts, is governed by federal law. Byrd v. Blue Ridge Rural Electric Co-Operative, 1958, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953, reh. den. 357 U.S. 933, 78 S.Ct. 1366, 2 L.Ed.2d 1375 (1958); ABC–Paramount Records, Inc. v. Topps Record Distributing Co., 5 Cir. 1967, 374 F.2d 455; Shirey v. Louisville & Nashville R. Co., 5 Cir. 1964, 327 F.2d 549; Braud v. Baker, 5 Cir. 1964, 324 F. 2d 213; 5 Moore, Federal Practice ¶50.06 at p. 2350 (2d Ed. 1966).

■ Our role here is limited. In Westborough Country Club v. Palmer, 8 Cir. 1953, 204 F.2d 143, 147, the Court said:

"As preliminary to a consideration of the contention that the court erred in denying the Country Club's motion for a directed verdict it would seem appropriate to call attention to the rule that where the motion has been denied and the jury has returned a verdict the evidence must be viewed in a light most favorable to the prevailing party. We must assume that the evidence proved all facts which it reasonably tended to prove and the prevailing party is also entitled to the benefit of all favorable inferences that may reasonably be drawn from the facts and circumstances proven. We cannot concern ourselves with any question of conflict in the evidence but must assume that all such conflicts have been resolved by the jury in favor of the prevailing party. Neither is it our province to weigh the evidence nor consider the credibility of the witnesses."

We have expressed the standard for reviewing a jury verdict. "We must determine whether the state of the proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." American Casualty Co. v. Myrick, 5 Cir. 1962, 304 F.2d 179, 182, 96 A.L.R.2d 1352. It is conceded that all of the medical testimony save that of Dr. White was devoid of ambivalence or equivocation in concluding that emphysema caused or contributed to the cause of death. Assuming that the jury disbelieved all of the testimony except Dr. White's, we need only consider whether Dr. White's testimony was sufficient to support the verdict. In the margin are the crucial excerpts from his testimony.[1]

1. "A. The cause of his death was that he suffered an accidental fall and suffered an intertrochanteric fracture of his left femur.
Q. Doctor, did we, in Mr. Hoffman's office—you and I and Mr. Hoffman—have a

long deposition of three hours or so awhile back in this case?
A. Yes, sir.
Q. And then at that time did Mr. Hoffman ask you this: 'Doctor, did this fall in and of itself and the operation that

Plaintiff's counsel on appeal argues that Dr. White's iteration and reiteration that the "cause" of death was the accident furnished sufficient evidence for a jury verdict in favor of the plaintiff. The trouble with this argument is that in making it counsel assumes that "cause" to Dr. White has the same meaning as "cause" in the insurance policy. But

causation, as expressed in the policy, is a legal term of art rather than a medical or popular concept.[2]

Wigmore discusses the problem:

" * * * [T]he difficulty arises from the employment in statutory or common-law phraseology of terms having also an untechnical use.

followed from the fall result in this man's death, to a reasonable medical certainty?' Do you recall that?

A. Yes.

Q. And do you recall what your answer was, Doctor?

A. My answer, as I recall it, was that it certainly did. * * *

Pulmonary emphysema was the mode or method by which this man died. He died suddenly while he was going to take a drink of water. However in reviewing all of the things that have gone on in his past history and in following him through the course of his hospital illness, my best judgment was that the method of dying or the mode of dying was due to respiratory failure due to the pulmonary emphysema.

Q. Again as to cause, Doctor, what was the cause of this man's death, in your opinion?

A. The cause of death was the hip fracture.

Q. In other words, what you are saying, if I may take the liberty of paraphrasing it, is that if a man falls off a building and he breaks every bone in his body, he might get some mucus in his respiratory tract and it would be respiratory failure due to the mucus, due to pulmonary emphysema? That would be the mode or method, but the cause was the falling off the building. Is that correct, Doctor?

A. Yes, sir.

Q. Doctor, I believe that you wrote a letter to the Prudential Insurance Company at their request. I think I have a copy of that letter here. I show you that letter. Referring you to the last paragraph where it says, 'In my opinion, this man died due to the aggravation of his pulmonary emphysema by an accidental fall which resulted in fracture of his left femur.' Would you again explain to the jury, because to a layman this may seem inconsistent. Would you again explain to the jury what you mean as to that statement?

A. Well, I felt it was fairly clear, but apparently it was not. In my opinion, the cause of his death was the accidental fall which resulted in the fracture of his

left femur. The reason he died after the operation was, in my best judgment, the aggravation of his pulmonary emphysema, although I am not completely certain about that. That is, I am not completely certain as to the pulmonary emphysema and the respiratory failure being the exact mechanism of his death. However, it is certainly a prominent feature of his illness. And without having done an autopsy, why, it was my best feeling that this was the explanation of his death.

Q. We are talking about the mode or mechanism of death, but on the other hand, the cause of death, as you stated, was the hip fracture and the resulting operation?

A. That is correct." * * *

[Cross Examination]

Q. Doctor, what was the actual cause of this man's death?

A. He fell and fractured his hip.

Q. Doctor, you said he fell and fractured his hip. And yet you have just previously testified that the emphysema and the tuberculosis were definitely significant and contributing factors to his death.

Is it correct to summarize your testimony to say that it is your belief, to a reasonable medical certainty, that the fracture and the treatment of the fracture as an active cause cooperated with the emphysema, and tuberculosis, and the adrenal insufficiency to cause this man's death? * * *

A. Well, I don't really know how to answer the question. I testified that this man had several chronic problems mostly related to his pulmonary emphysema; and that the method by which he died, I felt, was most likely due to respiratory failure as a result of his pulmonary emphysema. But the thing that caused him to die, which set this all in motion, was the fracture of his hip, his femur, and the surgery. Of course, he wouldn't have had the surgery if he wouldn't have had this fracture."

2. Compare the discussion of causation in fact in Prosser, Torts § 41 (3d ed. 1964), with the definition of cause in Webster's New International Dictionary at 356 (3d ed. 1966).

"Yet it seems unfortunate that a term existing in common use among laymen should be tabooed because the law also has been obliged to use it * * *. If a witness, in the course of his testimony, comes to mention that A 'possessed' or B 'owned' or C was 'agent', let him not be made dumb under the law, and be compelled by evasions and circumlocutions to attain the simple object of expressing his natural thought. *If there is a real dispute as to the net effect of the facts, these may be brought out in detail on cross-examination.*" 7 Wigmore, Evidence § 1960 (3d ed. 1940). [emphasis added]. See also § 1955.

Dr. White's mere recital that the accident was the "cause" of death has, without explanation of the facts leading to that conclusion, no more significance or evidentiary weight than the bald statement by a psychiatrist that a criminal defendant is "insane", or a businessman's unexplained assertion that a certain sale was, for income tax purposes, a "capital transaction." These conclusions all involve application of facts to a legal standard; unless that standard is explained, the conclusion is without weight.

On Dr. White's cross-examination, the factual basis of his conclusion was explained. He testified:

"* * * [T]his man had several chronic problems mostly related to his pulmonary emphysema; and * * * the method by which he died, I felt, *was most likely due to respiratory failure as a result of this pulmonary emphysema.* But the thing that *caused* him to die, *which set this all in motion,* was the fracture of his hip, his femur, and the surgery. *Of course, he wouldn't have had the surgery if he * * * [hadn't had] this fracture.*" [emphasis added]

This reasoning is also implied in the following portion of Dr. White's direct examination:

"In my opinion, the cause of his death was the accidental fall which resulted in the fracture of his left femur. *The reason he died* after the operation was, in my best judgment, *the aggravation of his pulmonary emphysema. * * *"* [emphasis added]

These portions of Dr. White's testimony are the only places in which he explained what he meant by "cause". Dr. White's conclusion, read without blinders, is that the accident was the "cause" of death because if there had been no accident, the insured would not have died from emphysema. It is quite clear to us that this notion of causation is but a relatively primitive version of what is known as "but-for" causation. See Prosser, Torts § 41 esp. at 242–3. On the other hand, the double indemnity clause of the policy expresses a far broader concept.

The Florida Supreme Court has construed substantially similar language in the policy thus:

"Double indemnity policies imposing liability when death results from bodily injury effected solely by external, violent and accidental means generally contain an exemption from such liability if death results directly or indirectly from disease or bodily infirmity. When such provisions are construed together or if the accidental injury and the preexisting disease or infirmity cooperate in causing the death of insured, doubled indemnity can not be recovered even though the injury is an active, efficient and procuring cause, provided the disease or infirmity contributes either directly or indirectly to causing insured's death."

Berg v. New York Life Insurance Company, Fla.Sup.Ct.1956, 88 So.2d 915, 917. The Maccabees v. Terry, Fla.Sup.Ct.1953, 67 So.2d 193. In Decker v. New York Life Insurance Co., 5 Cir. 1964, 328 F. 2d 650, 652, a case quite similar to the present one, we said in interpreting Florida law:

"* * * [I]t does not follow that death resulted directly and independently of all other causes from the accidental injury merely because the treatment of the injury impaired the treatment of the heart condition with the

result that the heart condition took a fatal turn. The decedent died of a preexisting heart condition and hence it was a cause of death. This, we think, is so even though the injury and the treatment of it were active and contributing causes. With the preexisting heart condition, whether called a disease or infirmity, contributing to the insured's death, there can be no recovery on the double indemnity provisions of the policy."

Dr. White did not testify that the accident and operation, as isolated contemporary occurrences, brought about the insured's death. Indeed, construed in the light of the standard expressed in these cases, Dr. White's testimony admits of no other interpretation than that the insured's death was brought about in part, or contributed to, by the chronic disease. The most tolerant semanticist could not brook any other construction of the expression that "the method or mode of dying" was the illness. This is also the clear meaning of Dr. White's other explicatory statement that "the reason he died after the operation was, in my best judgment, the aggravation of his pulmonary emphysema."

We therefore conclude that the jury had no basis in the evidence to conclude that the insured's death resulted from an accident "directly and independently of all other causes" within the policy's meaning. Therefore we hold that the trial court should have granted judgment for Prudential notwithstanding the verdict.

We grant judgment n. o. v. We do not remand to the trial court for consideration of whether Mrs. Schreffler should get a new trial, as we find the present case quite similar to the recent case of Neely v. Martin K. Eby Construction Co., 1967, 386 U.S. ——, 87 S.Ct. 1072, 1080, 18 L.Ed.2d 75, 85.

"In the case before us, petitioner won a verdict in the District Court which survived respondent's n. o. v. motion. In the Court of Appeals the issue was the sufficiency of the evidence and

that court set aside the verdict. Petitioner, as appellee, suggested no grounds for a new trial in the event her judgment was reversed, nor did she petition for rehearing in the Court of Appeals, even though that court had directed a dismissal of her case. Neither was it suggested that the record was insufficient to present any new trial issues or that any other reason required a remand to the District Court. Indeed, in her brief in the Court of Appeals, petitioner stated, 'this law suit was fairly tried and the jury was properly instructed.' It was, of course, incumbent on the Court of Appeals to consider the new trial questioned in the light of its own experience with the case. But we will not assume that the court ignored its duty in this respect, although it would have been better had its opinion expressly dealt with the new trial question."

Mrs. Schreffler does not claim error in the trial, and our examination of the record has revealed no indication of any possible ground for a new trial. This was a case treated by both parties as having only one issue: sufficiency of the evidence.

Reversed and rendered.