**HAR–PEN TRUCK LINES, INC., et al.,**
Appellants,

v.

**Frederick Allen MILLS, III, et al.,**
Appellees.

No. 23044.

United States Court of Appeals
Fifth Circuit.

May 31, 1967.

Rehearing Denied July 6, 1967.

Frank C. Jones, Macon, Ga., for appellants, Jones, Sparks, Benton & Cork, Macon, Ga., of counsel.

Benjamin Smith, Jr., Leon A. Wilson, II, Waycross, Ga., Harold Pomerantz, New York City, for appellees.

Before BROWN, GOLDBERG and AINSWORTH, Circuit Judges.

GOLDBERG, Circuit Judge:

At 9:20 p. m. on July 25, 1963, as a tractor-trailer truck with a 42,000 pound load of terra cotta pipe drove around a curve about two miles north of Waycross, Georgia, the load of pipe shifted and spilled over the side of the trailer and on to a car driving in the other direction. The falling pipe crushed the car, killing the driver, Allen Mills, and his wife, Patricia, and orphaning and injuring their three sons. The sons, together with their grandmother, Mrs. Tessie Mills, as next friend, now sue for their personal injuries and for the wrongful death of their parents.[1] After the filing of an amended pleading, the defendants stood as follows: Har-Pen Truck Lines, which contracted to haul the pipe; William Feldon, the truck driver; Pennington Trucking Company, the owner of the truck-tractor, the lessor of it to Har-Pen, and the employer of Feldon; Joiner Truck Lines, Inc., which owned the trailer; General Transfer and Storage Company, which leased the trailer from Joiner and in turn leased it to Har-Pen; and Oconee Clay Products Division of Griffin Pipe Products Company, which loaded the pipe and was the shipper. The plaintiffs also named Canal Insurance Company, Har-Pen's insurance carrier, as a defendant.

The jury found the defendants liable. It awarded $100,000 damages for each wrongful death and $2,500 for the personal injuries of the plaintiffs. On appeal, defendants admit their negligence and the lack of negligence of the Mills family; they argue that there was insufficient evidence to support the two $100,-000 verdicts for wrongful death, that certain expert testimony was erroneously admitted, and that a mistrial should have been granted because of prejudicial statements during final argument by plaintiffs' counsel.

We find no error, and affirm.

I. The liminal problem of jurisdiction does not long detain us. This contention is not only peripheral, but also insubstantial.

Defendants argue that the court should have submitted to the jury the issue of the citizenship of plaintiffs. Unless the trial judge wishes to use the jury advisorily, however, this is simply not a jury issue. Hardin v. McAvoy, 5 Cir. 1955, 216 F.2d 399; Seideman v. Hamilton, 3 Cir. 1960, 275 F.2d 224, cert. denied, 1961, 363 U.S. 820, 80 S.Ct. 1258, 4 L.Ed.2d 1517; see First National Bank in Greenwich v. National Airlines, Inc., 2 Cir. 1961, 288 F.2d 621, cert. denied sub nom. Kessler v. National Airlines, Inc., 1961, 368 U.S. 859, 82 S.Ct. 102, 7 L.Ed.2d 57. Further, every shred of evidence concerning the residence of the plaintiffs tended to show that at the relevant time they resided in either Florida or New York. The Mills family had lived in New York until April or May of 1963, when they moved to Florida. When the accident occurred, in late July, the family was again changing its residence from Florida to New York. Either the plaintiffs were residents of New York if they had not intended to remain permanently in Florida, or else they had become residents of Florida when they moved there. Defendants' counsel's cross-examination of Frederick Mills III, the eldest of the three sons, served only to underline these facts. Nowhere did defendants adduce anything to show otherwise. The trial judge, in rendering judgment, tacitly asserted that he found the requisite diversity. From the state of the evidence,

---

1. 29 Ga.Code Ann. §§ 105–1301 to 105–1310.

an explicit finding would seem superfluous.[2]

"A court that renders judgment against a defendant thereby tacitly asserts, if it does not do so expressly, that it has jurisdiction over that defendant." Chicago Life Insurance Co. v. Cherry, 1917, 244 U.S. 25, 29, 37 S.Ct. 492, 493, 61 L.Ed 966, 967; Jackson v. Southern Railway Company, 5 Cir. 1963, 317 F.2d 532, cert. denied, 1963, 375 U.S. 837, 84 S.Ct. 77, 11 L.Ed.2d 65.

II. The defendants also argue that all defendants not in privity with the Canal Insurance Company were misjoined. This argument is based on two cases in the Georgia courts concerning 20 Ga.Code Ann. § 68–612, which reads in part:

> "It shall be permissible under this Chapter for any person having a cause of action arising hereunder in tort or contract, to join in the same suit the motor carrier and its surety, in the event a bond is given. If a policy of indemnity insurance is given in lieu of bond, it shall be permissible to join the motor carrier and the insurance carrier in the same action whether arising in tort or contract."

This statute permits a motor carrier and its insurance company to be joined in the same suit as defendants. The two Georgia cases, Dishinger v. Suburban Coach Company, 1951, 84 Ga.App. 498, 66 S.E. 2d 242, and Reeves v. McHan, 1948, 78 Ga.App. 305, 50 S.E.2d 787, hold that where a motor carrier and its insurance company are joined as defendants, no other defendant may be joined who is not in privity with the insurance company. These cases cite for authority Ga.Code Ann. § 3–113, which reads:

> "3–113. Different claims may be joined, when—All claims arising ex contractu between the same parties may be joined in the same action, and all claims arising ex delicto may in like manner be joined. The defendant may also set up, as a defense, all claims

against the plaintiff of a similar nature with the plaintiff's demand."

This statute is held by the Georgia courts to prohibit the joining of contract and tort claims in the same action. Insofar as it does prohibit such joinder, however, it is not binding on federal courts in diversity cases. We have held that the question of which claims may be joined in a civil action is a federal one, to be governed by the Federal Rules. In Doyle v. Stanolind Oil & Gas Co., 5 Cir. 1941, 123 F.2d 900, 903, Judge Hutcheson said:

> "We agree with appellees. The question of joinder is purely one of procedure and is controlled by the federal rules. The Texas authorities appellants cite are without application. Rule 20(a), Permissive Joinder, in the largeness and comprehensiveness of its terms is peculiarly applicable here. Plaintiffs here, in the very terms of the rule, assert right to relief jointly and severally, or in the alternative, in respect of a series of transactions or occurrences and questions of law and of fact common to all of them arise in the action. It would be difficult to imagine a more apposite case."

See Texas Employers Insurance Ass'n v. Felt, 5 Cir. 1945, 150 F.2d 227, 231, 160 A.L.R. 931. The ascendancy of the Federal Rules over contrary state practice is emphasized by Hanna v. Plumer, 1964, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8. In that case (which held valid in a diversity case a service of process under Rule 4(d) (1) which would have been invalid under state law) the Supreme Court stated that it was a "fundamental" error to assume that "the rule of Erie R. Co. v. Tompkins [1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188] constitutes the appropriate test of the validity and therefore the applicability of a Federal Rule of Civil Procedure." The Court also said: "To hold that a Federal Rule of Civil Procedure must cease to function whenever it alters the mode of enforcing state-created rights would be to:

---

2. That the judge adverted to the question when he properly denied the defendants' request to charge on diversity is beyond doubt.

disembowel either the Constitution's grant of power over federal procedure or Congress' attempt to exercise that power in the Enabling Act." 380 U.S. at 473–474, 85 S.Ct. at 1145, 14 L.Ed.2d at 18. We have previously recognized the strength of this holding. Bryan v. Kershaw, 5 Cir. 1966, 366 F.2d 497; Follenfant v. Rogers, 5 Cir. 1966, 359 F.2d 30. See Lumbermen's Mutual Casualty Co. v. Wright, 5 Cir. 1963, 322 F.2d 759; United States v. 60.14 Acres of Land, 3 Cir. 1966, 362 F.2d 660. Cf. Monarch Ins. Co. of Ohio v. Spach, 5 Cir. 1961, 281 F.2d 401.

The Rules allow joinder in such a case as the present; indeed in order to prevent costly, slow multiplicitous litigation (with the danger of inconsistent results), they demand it. The Supreme Court has recently held that "Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." United Mine Workers of America v. Gibbs, 1966, 383 U.S. 715, 724, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218, 227. Against such powers and policies, the state restriction on joinder cannot stand.

III. The defendants claim that the $100,000 verdict for the wrongful death of Mr. Mills was excessive.

The only evidence concerning Mr. Mills's earnings is from Social Security records. This is apparently an incomplete record, showing intermittent earnings from 1956. This evidence shows that Mills's earnings fluctuated. In the last six weeks or so before his death, Mills earned at about the rate of $616 per month. During the last quarter of 1962, he earned at the rate of about $754 per month. Other periods show lesser earnings. In addition, there was testimony by Edward H. Walsh, an associate of Mills during Mills's last employment. Walsh testified that Mills was a competent salesman who could earn $15,000 a year, and that Mills had potential for higher achievement as a manager (at $25,000) and as an executive (at $50,000).

Mills was 48 when he died. The defendants introduced into evidence a mortality table indicating that Mills's life expectancy was 22.5 years; they also introduced an annuity table for computation of the present value of Mills's life. The annuity table discounts at a rate of 7 per cent in finding present value. These tables are suggested by Georgia law, but are not binding on the jury. See Book 32, Ga.Code Ann. at p. 458, 460, 461–468. E. g., Swift & Co. v. Lawson, 1957, 95 Ga.App. 35, 97 S.E.2d 168. Using these tables, if Mills's income is figured at the monthly rate of $616, the present value of his life was about $74,385. If the $754 figure is used, present value is $90,997. If the $15,000, $25,000 and $50,000 annual rates are used, the present values, respectively, are about $150,780, $251,300, and $502,600.

Defendants strenuously argue that the $616 and $754 monthly earning figures do not form a reasonable basis for computation because Mills worked only sporadically and his average earnings were much lower. In so arguing, however, defendants ignore the testimony concerning the future potential earning power of Mills. Past earnings are indicative but not conclusive, and defendants would have us stare fixedly at the past with no thought of change in the future. The jury did not have to ignore the possibility of future increases in earnings, when testimony which it could believe supported such a hypothesis. The jury came nowhere near stretching that evidence to the limit. If the jury were restricted to the past for its answers, its computation of loss might have to be purely arithmetic; but the jury may look forward as well as backward, as long as it relies on such relevant and appropriate evidence as is available. In personal injury and death cases, court and jury deal with the inchoate, the intangible, the destroyed potential of tomorrows. To ask the jury to be finite about such a future is neither realistic nor is it a judicially sensible

ambition. The future is not finite. We live in a world of probabilities, and the jury need not ignore them. In the main, a jury's calculation of damages must involve some speculation. Our job on appeal is to inquire whether the jury has exceeded the bounds of the probabilities presented by the evidence.

The question of whether a jury verdict may be set aside for insufficient evidence is one of federal rather than state law.

"* * * [I]n a diversity case, state law controls as to the substantive elements of plaintiff's case and of defendant's defense but the sufficiency of the evidence to raise a question of fact for the jury is controlled by federal law."

Shirey v. Louisville and Nashville R. Co., 5 Cir. 1964, 327 F.2d 549, 552. "We must determine whether the state of the proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." American Casualty Co. of Reading, Pa. v. Myrick, 5 Cir. 1962, 304 F.2d 179, 182, 96 A.L.R.2d 1352. In the recent case of Prudential Insurance Co. of America v. Schreffler, 5 Cir. 1967, 376 F.2d 397, 399 (decided April 25, 1967) we quoted the following passage from the Eighth Circuit's opinion in Westborough Country Club v. Palmer, 8 Cir. 1953, 204 F.2d 143, 147:

"As preliminary to a consideration of the contention that the court erred in denying the Country Club's motion for a directed verdict it would seem appropriate to call attention to the rule that where the motion has been denied and the jury has returned a verdict the evidence must be viewed in a light most favorable to the prevailing party. We must assume that the evidence proved all facts which it reasonably tended to prove and the prevailing party is also entitled to the benefit of all favorable inferences that may reasonably be drawn from the facts and circumstances proven. We cannot concern ourselves with any question of conflict in the evidence but must assume that all such conflicts have been resolved by the jury in favor of the prevailing party. Neither is it our province to weigh the evidence nor consider the credibility of the witnesses."

This language is again relevant here. To hold that the verdict as to Mr. Mills is based on insufficient evidence, we would have to demand that the jury be restricted to defendants' interpretation of the evidence. This we may not do. Defendants rely heavily on our case of Complete Auto Transit, Inc. v. Floyd, 5 Cir. 1958, 249 F.2d 396, cert. denied, 1958, 356 U.S. 949, 78 S.Ct. 913, 2 L.Ed. 2d 843. But, as is obvious from a reading of our opinion, in that case no evidence in the record could possibly have justified the verdict.[3] This is not true here. We hold the evidence sufficient as to Mr. Mills. Compare Prudential Insurance Co. of America v. Schreffler, supra.

IV. Defendants similarly argue that the evidence was not sufficient to support the jury's award of $100,000 for the wrongful death of Mrs. Mills. Again they rely on Complete Auto Transit, Inc. v. Floyd, supra, and again their reliance is misplaced. Here the distinguishing factor is the presence of the testimony of Chong Soo Pyun, a professor of economics at Mercer University. Professor Pyun testified as an expert on the value of the life of a hypothetical housewife in Mrs. Mills's position had she lived. Without valuing the immeasurables of love, moral guidance, inspiration, encouragement, and the other uncataloguable aspects of motherhood, Professor Pyun valued the mother's household services from the time of the accident until the youngest child arrived at the age of completing college. From

---

3. The only evidence there indicated that decedent earned up to $1,500 a year, with a life expectancy of 28.87 years. The present value, even without discount was thus about $43,400. With the 7 per cent discount it was about $16,410. The jury had awarded $107,500.

that point on, Professor Pyun assumed that Mrs. Mills could have worked outside her home until she reached retirement age nine years later, at the age of 62. To value household services, Professor Pyun measured "utility producing power" rather than the sum which Mrs. Mills might have earned. He testified:

"* * * [T]he capitalized monetary value of her prospective annual income is nothing but the money that she could have earned, if she had looked for employment. Now her utility producing power before that to the household is much greater than her money income producing power. In other words, if you wanted to hire substitutes for this housewife at the market place, you would have to pay a greater amount of money than the amount that she could have earned. Therefore, in order to compute it, in order to estimate the replacement cost of this housewife's services, we have to estimate the monetary [value] of her services on the basis of the market wage rates for each service which she was performing. * * *"

To value the work outside of the home, Professor Pyun chose 24 hypothetical occupations which he felt would be open to a woman of Mrs. Mills's age, education, and employment history. The professor randomly chose five of these 24 for computation of an average, and he testified that the error involved in such a choice was at most 5 per cent, which he characterized as standard deviation. Finally, the professor testified that the value of the household services over the 11 year span, reduced to present value by the 7 per cent discount, was $69,852. The value of the outside employment, similarly discounted, was $31,948. The total of these sums is $101,800.

The defendants offered no testimony in rebuttal of Professor Pyun's. They now contest its adequacy on several grounds.

First, the defendants argue that placing monetary value on the household services of a mother is "peculiarly a function of a jury", and that no direct evidence of that value by expert or non-

expert should be admitted, as such admission would invade the function of the jury. The defendants admit that there is no direct support in the law for such an argument, but they claim that it can be deduced from Georgia cases which hold that direct evidence of the value of the wife's services is not necessary for recovery of damages. There are such cases (E. g., Collins v. McPherson, 1954, 91 Ga.App. 347, 85 S.E.2d 552; Central of Georgia R. Co. v. Keating, 1932, 45 Ga.App. 811, 165 S.E. 873; see Blue's Truck Line v. Harwell, 1938, 59 Ga.App. 305, 200 S.E. 500), but the defendants' conclusion does not follow. The cited Georgia cases had to deal with situations where there was quite clearly a loss, but no testimony available to evaluate it. But the Georgia courts have expressly sanctioned use of opinion evidence and expert testimony to evaluate services rendered, where that was possible. Western & A. R. Co. v. Townsend, 1926, 36 Ga.App. 70, 135 S.E. 439. In the leading case of Standard Oil Co. v. Reagan, 1915, 15 Ga.App. 571, 84 S.E. 69, the trial court had accepted direct evidence of dollar value of a wife's services in the home for the duties of nurse, cook, housekeeper, and seamstress. The Georgia Court of Appeals found that the testimony was correctly admitted. See Shermer v. Crowe, 1936, 53 Ga.App. 418, 186 S.E. 224.

From the cases it appears clear to us that the Georgia courts tend to accept whatever probative evidence can be offered, in the attempt to compensate for the loss in a just manner. The expert testimony in the present case is a more modern and scientific version of that accepted in Standard Oil Co. v. Reagan, supra. Professor Pyun's construct, based on scientific study, investigation, and analysis, was more nearly complete than what was available in the earlier days of Standard Oil Co. v. Reagan. The brittle, unemotional calculus computed by Pyun was what the sons would have had to pay for services to be rendered by an ersatz mother. Such modern scientific testimony is more reliable than

the jury's unbounded musings of yester-years.[4]

■ Second, the defendants argue that Professor Pyun based his testimony on a standard of recovery not authorized by the statute. The statute reads:

"105–1308. The full value of the life of the decedent, as shown by the evidence, is the full value of the life of the decedent without deduction for necessary or other personal expenses of the decedent had he lived."

The defendants argue that, because Pyun based his computation on the cost of replacement of Mrs. Mills's services, he calculated damages assuming that the statute's standard was compensatory, whereas, they argue, the Georgia cases show that the statute is actually punitive. This argument sounds anomalous and is anomalous. The basic factor of damages in this case is that the value of the services of Mrs. Mills is best expressed by what it would have cost Mr. Mills and the Mills children to replace her services. See Complete Auto Transit, Inc. v. Floyd, supra, and its complete discussion of the applicable Georgia cases, 249 F.2d at 399–400. The punitive aspect of the statute is its last phrase: "without deduction for necessary or other personal expenses of the decedent had he lived." This phrase means that the standard of recovery is not confined to the actual pecuniary loss of the plaintiff, but includes the full monetary value of the life of the deceased, no matter how much of that value would have found its way into the hands of the plaintiff had the deceased lived. This principle is explained by the following quotation from Collins v. McPherson, 1954, 91 Ga.App. 347, 351, 85 S.E.2d 552, 555–556. In

that case the parents sued for the wrongful death of their child. The court said:

"* * * [T]he measure of damages set as the full value of the life of such child without deduction for the necessary or personal expenses of the decedent in Code § 105–1308 is in itself an arbitrary standard having little relation to the pecuniary loss sustained by the parents. In Savannah Electric Co. v. Bell, 124 Ga. 663, 669, 53 S.E. 109, 112, it is stated: 'This is nothing more nor less than a legislative imposition of a penalty upon the person who causes the death of another by negligence, the penalty to go to the person injured. While such legislation is punitive so far as the defendant is concerned, it is compensatory so far as the plaintiff is concerned; but exact compensation for the loss sustained is not the primary object of the statute, though in many cases this result may be brought about.' In Atlantic, Valdosta & W. Ry. Co. v. McDilda, 125 Ga. 468, 470, 54 S.E. 140, 141, it is held that the statute 'is remedial in that there must be a dependence upon the person killed, and a contribution to the support of the plaintiff must have been made by the deceased. It is penal in that the measure of the recovery is the full value of the life of the deceased, irrespective of its real value to the person in whom the cause of action is vested.' While the act is still partly compensatory in character, it is no longer remedial in the sense that contribution and support must be shown as a basis for recovery. It no longer purports to compensate the parent for a purely pecuniary loss.

\* \* \* \* \* \*

Thus, both in the compensatory and the penal elements of the verdict, the jury is guided by its discretion in assessing the amount and not by

4. Academicians are not anathema to the judicial process, and use of such expert testimony is not uncommon in actions for the wrongful death of a wife and mother: Lithgow v. Hamilton, Fla.S.Ct.1954, 69 So.2d 776 (owner of domestic employment agency); Curnow v. West View Park Co., W.D.Pa.1963, 220 F.Supp. 367 (family relations expert); Legare v. United States, S.D.Fla.1961, 195 F.Supp. 557 (professor of economics), Merrill v. United Air Lines, S.D.N.Y.1959, 177 F. Supp. 704 (home economist).

pecuniary loss to the plaintiff. \* \* \* The general rule is recognized and adhered to, that the full value of the life of an adult, or of a minor who has a known earning capacity and is actually producing income which may form the basis for calculation of the value of the life, or of an adult person who, although not gainfully employed, is rendering services capable of measurement in monetary terms, should be ascertained and reduced to present cash value."

Recovery in that case was not limited to the parents' actual pecuniary loss. In the present case, this punitive provision of the statute is almost irrelevant, because all of Mrs. Mills's services as a mother went without deduction for the benefit of her family. See Willitt v. Purvis, 5 Cir. 1960, 276 F.2d 129.

■ Thirdly, the defendants claim that it was error to allow Professor Pyun to testify that he thought that the 7 per cent discount rate used in Georgia for calculating present value was excessive. Professor Pyun testified that he thought a 4 per cent rate was more realistic, and stated at one point that the present value of Mrs. Mills's services as a mother (excluding her outside earning abilities), if discounted at the 4 per cent rate, yielded a present value of $105,547. However, this only happened once, and upon admonishment by the trial judge, Pyun gave the sum arrived at by discounting at the higher rate ($69,852), and gave all subsequent figures using the proper method. Certainly considering that the Georgia cases uniformly hold that the 7 per cent rate is only suggested and not mandatory, and that the offending statement was immediately corrected and never repeated, if there was error, it was harmless. We hold that the testimony of Professor Pyun was proper, and sufficient to support the verdict.

V. By way of valediction we consider defendants' taking an abhorrent view of the closing arguments to the jury by plaintiffs' counsel. In the record of plaintiffs' counsel's closing argument we find the following:

"I just ask this jury to make a self case out of it; set the value that you would want placed on the mother of your own children, and I think we would be willing to settle for the value of the life of the mother of Mr. Jones' children, the value that she places on —that he places on her.

Mr. Jones:

Your Honor, I object to that argument and I move for a Mistrial in this case. That is entirely inappropriate, prejudicial argument.

The Court:

Yes. Members of the jury, you will disregard the argument just made by counsel, in which he refers to the value of the life of any other person, any other person. That is inappropriate argument and I am sure that Judge Smith will agree, on reflection. The question at issue here is the value of the life of the deceased, Mrs. Mills, and to equate, to equate it with the value of the life of any other person is not an appropriate standard. And I instruct you to disregard that line of argument.

Mr. Smith:

I certainly want to apologize to the Court and say that the Court is correct. I did get carried away a little bit and I agree with the Court that it is improper, that it is an improper statement to make upon reflection. \* \* \*

■ It's not right to put this burden on this poor old worn out lady; put it on the backs of the people where it belongs; put it on the backs of the ones where it belongs. Just make a self case out of it. I believe you might find one man in Georgia to say that these lives have no value but, I don't believe you can get 12 good men in the State of Georgia, my State and your State, to say these strangers in our midst are not entitled to the full amount, to full justice—not half a loaf. But make a self case of it, what man

is there if his son asks for bread, would he give him a stone? And what man is there of you if he asks a fish, would he give him a serpent? \* \* \*

But we're not asking for a handout. We are just here asking for simple justice, not a half a loaf of justice, not 75 per cent of justice, but justice as borne out by the facts in these cases. And we trust that you gentlemen will apply the yardstick of justice in these cases and make a self case out of it, how you would want your children treated, and I think you will come up with the right thing."

In motions for judgment n. o. v. and a new trial this argument was urged as erroneous. We are here governed by federal law, as expressed in Johnson v. Colglazier, 5 Cir. 1965, 348 F.2d 420, 422–423:

"It would seem that under the test of Byrd v. Blue Ridge Electric Cooperative, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), as applied by this court in Monarch Ins. Co. of Ohio v. Spach, 281 F.2d 401 (5th Cir. 1960) and also under Maryland Cas. Co. v. Reid, 5 Cir., 76 F.2d 30, the question of the propriety of counsel's argument and the judge's action and non-action with respect thereto is a matter of trial procedure controlled by federal law. This is so because there must be weighed, against possible differences in outcome because of choice of forum, the needs of the federal courts, as an independent system of courts, to follow such procedures as will best enable them to carry out their constitutional duty to fairly and justly hear and adjudicate. Spach recognized as '[a]n important countervailing policy consideration in the Blue Ridge sense' the purposes of the Federal Rules and the Enabling Act to provide, on matters of practice 'an approach to uniformity within the whole federal judicial system'."

Yeargain v. National Dairy Products, 8 Cir. 1963, 317 F.2d 779.

The argument objected to here is known among lawyers and judges as the "golden rule" argument. While federal law controls us, it is not impertinent to remark that no Georgia case condemns this argument even though we are certain that Georgia lawyers in state courts use it and have used it, the memory of man running not to the contrary. The objection to it is no fixed constellation in our judicial firmament, and much can be said against its immutability. See Judge Brown in dissent in Johnson v. Colglazier, 5 Cir. 1965, 348 F.2d 420, 425–430.

The "golden rule" argument is supposed to be erroneous because it requests the jury to put itself in the plaintiff's shoes in computing damages when the jury should compute the damages objectively. F. W. Woolworth Co. v. Wilson, 5 Cir. 1934, 74 F.2d 439, 98 A.L.R. 681. But the jury box is not an isolation booth where one's past is non-existent. A juror's oath does not obliterate his past life and it is not supposed to drop an iron curtain over everything save that which emanates from the courtroom. The mention of the proposition that one way to attempt to measure damages is to imagine one's self in the plaintiff's position seems to us a superfluous suggestion to a reasonably intelligent juror. He is sure to think of it himself. The best that can be done when the suggestion is made is for the court to indicate, as it did here, the legal impropriety of the notion. The serious problem is not in the transmission of this method for computation of damages. We do not think that can be stopped. The real danger is that the sympathy and the feelings of the jury will be encouraged and aroused so that the jury will decide the case and award damages out of relation to actual fault and actual damage. Judge Sibley's opinion makes this the point of this Court's condemnation of the "golden rule" argument in F. W. Woolworth Co. v. Wilson, supra, 74 F.2d at 443.

"Sympathy for suffering and indignation at wrong are worthy sentiments, but they are not safe visitors in the courtroom, for they may blind the eyes

of Justice. They may not enter the jury box, nor be heard on the witness stand, nor speak too loudly through the voice of counsel. In judicial inquiry the cold clear truth is to be sought and dispassionately analyzed under the colorless lenses of the law."

 In the present case the argument was objected to immediately and immediately corrected. After this correction, the trial judge devoted the first portion of his charge to explanation of the error and a detailed admonishment of the proper standard. These corrective measures were not taken in *Colglazier,* supra, or *Woolworth,* supra. They were not taken, either, in Maryland Casualty Co. v. Reid, 5 Cir. 1935, 76 F.2d 30, 32–33, where Judge Hutcheson said:

"For a common-law jury trial is at least a trial, with its attack and its defense, its action and its suspense, and not a scientific inquiry, which in a leisurely and impersonal way may continue indefinitely until the quest is at an end. Because these things are so of jury trials, it is of the genius of our institutions that they be conducted under the firm and steady guidance of judges as administrators, who having minds trained and personalities adequate to the task, are held primarily responsible for their just outcome. Because these things are so, in a federal court at least, the conduct of jury trials is largely confided to the District Judge, who is expected to have and exercise trial skill of the highest order, and a wise and just discretion. His chief function, his primary object, is to keep the case within legal bounds by admonitions and rulings from its beginning to its end.

\* \* \* \* \* \*

At common law and by statute, the federal District Judge is charged with the duty of granting a new trial in a jury case where, in his opinion, it went unjustly and injuriously out of bounds. This court, as to law cases, is a court of error. We do not retry the case. We review the record made in it for reversible error, error by the judge, in conducting or failing to conduct the trial, which has, by permitting the case to get out of bounds, prejudiced the just result. \* \* \* Abstract inerrancy is hardly possible in the trial of a case in the federal court; it is never an essential to a valid trial there. Jennings v. United States (C.C.A.) 5 Cir., 73 F.2d 470; Community Natural Gas Co. v. Henley (C.C.A.) 5 Cir., 54 F.2d 59. Too much is said and done about too little in the heat and hurry of a trial, for it all to be important. Things of no moment in their transpiring are not made momentous merely by making record of them. Therefore, though the District Judge is an administrator primarily charged with the just conduct of the trial, he may not ordinarily be put in error merely because an aberration from trial rules has occurred. It is the duty of counsel by objection to call such threatened or actual departure to the judge's attention, and invoked his corrective action, and, if overruled, to make it appear that prejudice has resulted."

The close supervision repeatedly demonstrated by the trial judge in the present case corrected the error to the extent correctible; and the trial judge was within his discretion and his peculiar competence in assessing the error as not sufficiently inflammatory to call for a new trial. Pasotex Pipe Line Co. v. Murray, 5 Cir. 1948, 168 F.2d 661.

Affirmed.

### ON PETITION FOR REHEARING EN BANC

Before BROWN, GOLDBERG and AINSWORTH, Circuit Judges.

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25(a), subpar. (b), the Petition for Rehearing En Banc is denied.